1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3                          No. 1:15-cr-10008-LTS

4

5    UNITED STATES OF AMERICA

6

7    vs.

8

9    R. DAVID COHEN

10

11                     *********

12

13                  For Hearing Before:
                  Judge Leo T. Sorokin

14

15                     Sentencing

16

17               United States District Court
                 District of Massachusetts (Boston.)
                 One Courthouse Way

18               Boston, Massachusetts 02210
                 Wednesday, May 25, 2016

19

20                     ********

21

22          REPORTER: RICHARD H. ROMANOW, RPR
                  Official Court Reporter

23               United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210

24               bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3   RYAN M. DiSANTIS, ESQ.
     S. THEODORE MERRITT, ESQ.
 4      United States Attorney's Office
        One Courthouse Way, Suite 9200
 5      Boston, Massachusetts 02210
        (617) 748-3251
 6      E-mail: Ryan.disantis@usdoj.gov
        For the United States of America
 7

 8   JAMES B. KRASNOO, ESQ.
        Krasnoo, Klehm & Falkner, LLP
 9      28 Andover Street, Suite 240
        Andover, Massachusetts 01810
10      (978) 475-9955
        Email: Jkrasnoo@kkf-attorneys.com
11      For the defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2          (Begins, 2:00 p.m.)

3          THE CLERK:  The United States of America versus R.

4    David Cohen will now be heard before this court.  Would

5    counsel please identify themselves for the record.

6          MR. DiSANTIS:  Good afternoon, your Honor, Ryan

7    DiSantis for the United States.

8          MR. MERRITT:  Good afternoon, your Honor, Theodore

9    Merritt for the United States.

10          THE COURT:  Good afternoon.

11          MR. KRASNOO:  Good afternoon, your Honor, James

12    Krasnoo for the defendant, David Cohen, who is present

13    with me at counsel table.

14          THE DEFENDANT:  Good afternoon, your Honor.

15          THE COURT:  Good afternoon, Mr. Cohen.

16          What I propose to do is first go through the

17    guideline calculation by probation, calculation by

18    calculation, resolving any objections, and then when

19    we're done with that we'll have my settled guideline

20    calculation, then I'll address any other objections to

21    the presentence report you might have that remain,

22    Mr. Krasnoo, and I'll consider those as well as, um -- I

23    don't know if you want to argue departure separately, if

24    you want to, that's fine, and then I'll turn to

25    recommendations after that in terms of what sentence to

1    impose.

2         MR. KRASNOO:  Your Honor, as a preliminary matter,

3    um, I was not made aware yesterday that Mr. Gonzalez-

4    Pabon was going to testify.  Though I had requested it,

5    I had no ruling from the Court on my motion for an

6    evidentiary hearing, and in addition I had never been

7    notified by the government that he was coming in.

8         Your Honor will note that during yesterday my

9    partner brought in a large heavy box of material and we

10   had started to go through it and shortly while we were

11   going through it your Honor had said, "I'll give you 5

12   minutes more."  Over the nighttime, your Honor,

13   Mr. Cohen and I have gone through that box and have

14   further evidence that we would want to submit to the

15   Court.  All pieces of paper that came to us from the

16   government, they have with Bates stamp numbers on them,

17   that show the expenditures by Mr. Gonzalez-Pabon to

18   various people that further tend to undermine his

19   testimony.

20        I'll give you just one example for the moment.  He

21   did write checks to his cousin, he said so, that she

22   helped him out at the office.  Well, we told your Honor

23   that from October 3, 2013, down to November 26th, 2013,

24   she was paid $22,000 plus for just helping out at the

25   office.  So that would be $11,000 per month if it was

1  done -- um, divided equally.

2       Similarly we have, um, from the TD Bank, several

3  documents showing the active use of those monies for

4  buying cars, selling cars, invoices for cars, repairs

5  for cars.  We also have, um, individual payments from

6  gas stations, restaurants, um --

7       THE COURT:  From which account?  Is this still TD

8  Bank?

9       MR. KRASNOO:  TD Bank, your Honor, is the cars.

10 The Bank of America is the, um, the one that shows auto

11 parts, um, Hess, Budget Truck, um, restaurants, Valley

12 Restaurant, El Taco Guapo, um, UHaul, um, For Life

13 Merchandise, um, just from June to August.  From October

14 we have Cricket Debt, Lexington Eye Care, Wal-Mart,

15 Santander withdrawals, um, a Bank of America ATM.  We

16 also have, your Honor, um, monies sent by Western Union

17 from June 5th, 2013 all the way down to November 1st,

18 2013, and some of the amounts were extraordinarily

19 substantial.  In the month of October 1, 2013,

20 $79,666.85 was transferred.  Um, on September 3rd --

21      THE COURT:  From which account to which account?

22      MR. KRASNOO:  Sorry?

23      THE COURT:  The $79,000.

24      MR. KRASNOO:  $79,666.85 for wire transfers.

25      THE COURT:  From where to where?

1          MR. KRASNOO:  From the, um -- it's AD Professional

2    Associations, um, the account number --

3          THE COURT:  I don't care about the account number,

4    I just want to know the bank.

5          MR. KRASNOO:  It's Bank of America, your Honor.

6          THE COURT:  All right.

7          MR. KRASNOO:  And in the month before that, um, it

8    was $53,750.90 transferred.  In the month before that,

9    which would be August, $39,612.85.  In the month before

10   that, in July and in June, it's $35,300.90.  So we're

11   not talking about insubstantial amounts of money coming

12   out of the account that he caused to be

13   wire-transferred.

14          We also, your Honor, added up and found that there

15   were a total of 59 checks that came, um -- the tax

16   refund checks, and they, your Honor, beared New York and

17   New Jersey addresses, and we know that -- from all of

18   the evidence, they never went down there.  We also know

19   from the bank checks that came in at the trial, your

20   Honor, that they are all located somewhere around the

21   Lawrence area.  The New York and New Jersey ones were

22   clearly done by someone else.  And Mr. Dubin Gonzalez

23   frequently went to New York as we brought out yesterday.

24          THE COURT:  All right.

25          MR. KRASNOO:  Those are some of the things that we

1   found overnight that I would have asked him about, um,

2   had I had the time to have prepared for his coming.

3        MR. MERRITT:  Well, your Honor, I just want to

4   point out that, um, that's fairly consistent with his

5   testimony that Mr. Grullon was also controlling that

6   account.  So to ascribe all that -- those amounts of

7   those checks and those transfers to, um, some

8   independent action on Gonzalez's part, I don't think

9   there's a basis for doing that.

10       THE COURT:  I'm only focused -- I take your point.

11  I'm just focused here not on -- I'm focused here on what

12  facts support or don't support the guideline

13  enhancements with respect solely to Mr. Cohen because

14  he's the only one I'm sentencing, I'm not making any

15  determinations beyond that regarding other people in the

16  -- you know, I'm not making any independent

17  determinations about relationships between Grullon and

18  others because, um, this is a sentencing just of

19  Mr. Cohen, it's about Mr. Cohen's role, what

20  enhancements or not.  So --

21       MR. MERRITT:  But it's also -- he's a member of a

22  conspiracy and whether --

23       THE COURT:  Yes.

24       MR. MERRITT:  -- those amounts are reasonably

25  foreseeable is also --

1          THE COURT:  Yes, but as to whether they're

2     foreseeable, the conspiracy's a different question than

3     whether they're particularly attributable solely to

4     Gonzalez or solely to Grullon or to both of them, and I

5     think to that extent I'm not sure I need to resolve

6     that.

7          MR. MERRITT:  Okay.

8          THE COURT:  And if you think I do, tell me, or

9     after I make my findings you can tell me and I will.

10          All right.  And I take it you don't really dispute

11     the transfers that came in, these are bank records that

12     he's referring to, I understand, Mr. Krasnoo, and you're

13     not --

14          You don't dispute that transfers were made out of

15     the accounts to the various payees that were listed on

16     the bank statements?

17          MR. DiSANTIS:  We don't, just as Mr. Krasnoo

18     doesn't dispute the over $44,000 in checks that go to

19     Mr. Cohen from these accounts.

20          THE COURT:  Fine.

21          Anything else, Mr. Krasnoo?

22          MR. KRASNOO:  No, your Honor.

23          THE COURT:  All right.  Fine.

24          The probation office, I think correctly, but I

25     want to make sure nobody objects to this, dealt with --

 1   took the various different offenses which Mr. Cohen was

 2   convicted of, that is conspiracy, the multiple counts

 3   of, um, conversion of government property, and the money

 4   laundering conspiracy, and grouped them all together and

 5   essentially said the fraud guideline, 2(b)(1.1), applies

 6   by way of the money laundering guideline.

 7        Does that -- do you both agree that -- or does

 8   anybody object to that construct?

 9        MR. DiSANTIS:  The government agrees to that

10   construct, your Honor.

11        THE COURT:  And you would not object, Mr. Krasnoo?

12        MR. KRASNOO:  No, and in fact I stated that in the

13   objections to --

14        THE COURT:  No, I understand, but I just want to

15   be clear as we go through it.

16        All right.  So then I find first that there's a

17   base offense level of 6.

18        Do you both agree with that?

19        MR. DiSANTIS:  Yes, your Honor.

20        MR. KRASNOO:  Yes, your Honor.

21        THE COURT:  All right.

22        The next question is whether --

23        You think it's a plus 14, right, Mr. Krasnoo, and

24   the government, you say it's a plus 16 based on the

25   additional, um, what I'm going to call loosely the "post

1    IOLTA checks?"

2          MR. DiSANTIS:  Yes, your Honor.

3          THE COURT:  Okay.

4          MR. KRASNOO:  Yes, your Honor.

5          THE COURT:  All right.

6          I find that it's a plus 16.  I find that all of

7    the checks and loss amount set forth in the presentence

8    report is relevant conduct to and part of the same

9    course of conduct of Mr. Cohen's offenses of conviction,

10   um, that is there was -- at the trial was essentially

11   evidence and testimony regarding many checks that

12   Mr. Cohen deposited into various IOLTA accounts that he

13   controlled and all of that there doesn't seem any

14   dispute, not only the checks that were at issue in the

15   trial, but all of the other IOLTA checks are

16   attributable to Mr. Cohen.

17         I find, for purposes of the sentencing guidelines,

18   relevant conduct, the same course of conduct, that also

19   applies to all of the checks and loss amounts set forth

20   in the presentence report in the, what I call the "post

21   IOLTA period," that is the checks that were deposited in

22   the AD Professional and the various other AD accounts

23   set forth in the presentence report.  I make that

24   finding for -- based on the record before me and what's

25   in the presentence report, but I particularly highlight

1    a number of things.

2         First, when the scheme stopped using Mr. Cohen's

3    IOLTA accounts and moved to the AD-related banking

4    accounts, Mr. Cohen remained involved, specifically

5    Mr. Cohen opened the AD Professional account at

6    Citizen's Bank and he did so in the presence of Oscar

7    Grullon.  Only Mr. Cohen could have given Mr. Grullon

8    the debit card and access to that account, which the

9    evidence before me shows that Mr. Grullon then deposited

10   the U.S. Treasury checks in, and this came after many

11   U.S. Treasury checks had been deposited by Mr. Cohen in

12   his own IOLTA accounts.  And so I find that supports his

13   continuing involvement.

14        He even went on, Mr. Cohen opened with Mr. Grullon

15   the AD Professional account at People's United, and then

16   later, when confronted by the bank's security officer

17   who's calling in --

18        Am I correct that that police officer who

19   testified -- the former police officer who was from

20   Maine, was a bank security officer for People's United?

21        MR. MERRITT:  Yes, your Honor.

22        THE COURT:  All right.  And when, um, he had the

23   interaction on the telephone with that bank security

24   officer, um, Mr. Cohen was not truthful to that bank

25   security officer.  All this fits and is at peace with

the earlier conduct that was proved at the trial.

Second, Mr. Cohen was involved in and
participating in the conspiracy during this post IOLTA
period as evidenced first by what I've already
described.  I watched -- I didn't make this clear before
but I watched the entire DVD that Mr. Krasnoo submitted
to me -- I do note for the record it's not 90 minutes,
it's 2 hours and 14 minutes, and I watched portions of
it more than once, um, and I find that Mr. Cohen was
involved in and participating in the conspiracy during
this post IOLTA period.

Mr. Gonzalez's post-arrest statement that when
bank accounts closed Mr. Cohen -- he would bring this --
he would tell Mr. Cohen about this and Mr. Cohen would
just tell Mr. Gonzalez to open another account and
withdraw money in different or smaller increments, that
is further evidence of this.  As is Mr. Gonzalez's post-
arrest statement in that DVD that Mr. Cohen, when being
pressed by the agents about the U.S. Treasury checks,
Mr. Gonzalez says "Mr. Cohen knows everything about this
side of the business," that is the U.S. Treasury check
deposit side of the business as opposed to the, um,
renting of the hall and some of the other things that
occurred.

There's also evidence, undisputed evidence that

1    Mr. Cohen received checks in the amount of $44,000 from

2    these post-IOLTA bank accounts, both checks drawn before

3    and after Mr. Grullon left the United States for the

4    Dominican Republic.  I don't find credible the notion

5    that these checks were payback for loans from Mr. Cohen

6    to Mr. Gonzalez to buy cars.  That's not what

7    Mr. Gonzalez said in the interview, the post-arrest

8    interview when given the chance, he did say he wrote

9    checks to Mr. Cohen and referred to giving them to

10   Mr. Grullon.  I think he was given the opportunity in

11   that interview to -- when asked about the checks, to

12   simply say they were payback for loans, and he didn't

13   say that, and that would be a -- well, there's nothing

14   incriminating about paying loans back, and I think in

15   that particular context, having just been arrested and

16   not advancing the nonincriminating reason is itself, um,

17   inculpatory in this situation or really not so much

18   "inculpatory," but credits the evidence I have before

19   me.

20        And so, um, I generally find Mr. Gonzalez's

21   testimony that Mr. Cohen was involved in the

22   check-cashing and receiving money from and during the

23   post IOLTA period credible.

24        I credit, third, Mr. Gonzalez's testimony that

25   Mr. Cohen arranged the payee's signature and

notarization on the confirmation of endorsement forms

demanded by one of the banks and that we heard testimony

about yesterday.  I base that conclusion on a number of

things.

First, I compared the signatures and other writing

that Mr. Gonzalez attributes to Mr. Cohen with known

signatures by Mr. Cohen and other known writings that

Mr. Cohen himself at the trial testified that he wrote,

and I find, based on that comparison, that it's

Mr. Cohen's writing on these endorsement forms in the

payee and notarization section.

I also find Mr. Gonzalez's testimony on this point

credible based on his post-arrest statement, um, and --

and based on his post-arrest statement Mr. Cohen is

someone who Mr. Gonzalez looked to both as a friend and

as a sort of advisor in some way and so this is

precisely the type of document that would be, um,

credible and make sense that Mr. Gonzalez would take to

Mr. Cohen in those circumstances.  But it's augmented by

the fact that throughout the entire relevant period here

Mr. Gonzalez was living with Mr. Cohen, Mr. Gonzalez

came to Massachusetts at Mr. Cohen's suggestion and

invitation and was connected by Mr. Cohen to

Mr. Grullon.

So I -- I think that suffices and for those

1    reasons I find that it's a plus 16, um, that all of the

2    loss amount in the presentence report is attributable as

3    relevant conduct.  I note your objection, Mr. Krasnoo,

4    and it is preserved.

5         Next, probation assigns, um -- I'm not sure

6    which -- they assign plus 2 for 10 or more victims of

7    this offense.

8         You agree with that, do you not, Mr. DiSantis,

9    that's understood from your papers?

10        MR. DiSANTIS:  We do, your Honor, and we include

11   in our calculation the IRS as well as I believe there

12   are 16 victims referenced in the 15 MOIs we submitted as

13   Exhibit B in our sealed file.

14        THE COURT:  All right.

15        Mr. Krasnoo, do you object to this plus 2?

16        MR. KRASNOO:  I do.

17        THE COURT:  All right.  And the basis is?

18        MR. KRASNOO:  The basis, your Honor, is they have

19   never been his victims, he didn't meet them, he had no

20   relationship with them at all, he didn't know them.

21   They're names on a check.  They could have been

22   nonexistent people on tax refund checks.

23        THE COURT:  All right.

24        MR. KRASNOO:  They're not his victims.  The IRS

25   may be a victim, but I make arguments about the IRS as

1   well, that they're certainly complicit in it.  And why

2   you can't charge the IRS as a co-conspirator, the fact

3   of the matter is that their malfeasance in how they

4   treated these and allowed these sticks of dynamite to go

5   out so that they could be blown up, because that's what

6   they are, is basically shameful, and it's repetitive

7   year after year after year.  I understand that the

8   willful blindness instruction applies only to Mr. Cohen,

9   but willful blindness on the part of the government in

10  letting these checks go out on those kind of tax returns

11  is equally shameful and there as well.

12        And so for that reason I think that although the

13  IRS qualifies as a victim, um, especially under the

14  rules that government entities can qualify as victims,

15  in this Commonwealth jurisdiction here --

16        THE COURT:  Well, he doesn't get the plus 2 --

17  with or without the IRS, he doesn't get the plus 2, he

18  gets a plus 2 only if the other people count.

19        MR. KRASNOO:  That's right, and I don't think

20  they're victims --

21        THE COURT:  Because a plus 2 applies if there's 10

22  or more.

23        MR. KRASNOO:  I think they're certainly victims if

24  anyone stole their identities, but he did not.  I think

25  they're victims as to people whose checks were stolen

1    from them in some way or whose false tax returns were

2    made with their information, but he did not do that.

3         THE COURT:  All right.  I -- I don't agree, just

4    so the record is clear, that the IRS is, I think the

5    phase used, was "equally shameful" as what occurred here

6    by Mr. Cohen, I don't agree that the IRS was equally

7    shameful.  I don't think I need to go into the reasons

8    why other than to say that I think that that's -- that

9    you're well within your rights to say it, if you wish,

10   but I disagree with that characterization of the record

11   or the evidence, the conduct of Mr. Cohen or the conduct

12   of the IRS.  I'm not saying that the conduct -- I'm not

13   saying the IRS procedures are perfect, but I don't think

14   they're equally shameful.

15        MR. DiSANTIS:  Your Honor, I would just add two

16   very brief points.

17        The first is that the guidelines, as we state in

18   our memo, speaks in terms of the offense of conviction

19   as to who the victims are, and here this is part of a

20   SIRF scheme, and, you know, at the very least Mr. Cohen,

21   whether he knew or not --

22        THE COURT:  I agree that -- I mean I could hear

23   you, but I agree the two points apply.

24        MR. DiSANTIS:  Enough said.

25        THE COURT:  All right.

1          I find that the 2 points apply under the

2     guidelines for the following reasons.  The, um, scope of

3     relevant conduct, which is the universe of information

4     that the guidelines direct and require me to consider in

5     evaluating each of these enhancements, includes not just

6     the conduct that Mr. Cohen actually, um, committed, but

7     it includes the whole course of conduct here and that

8     includes the, um, theft of the identities of the many

9     individual people whose identities were stolen and then

10    in whose names, but without their knowledge or consent,

11    federal tax returns were filed on their behalf with the

12    Internal Revenue Service, which led to the checks.

13         And just so the record's perfectly clear, although

14    the definition of "victims" under 2(b)(1.1) says "any

15    person who has sustained any part of the actual loss,"

16    um, is a victim, but that would not include the people

17    whose identity was stolen because they didn't suffer the

18    actual -- or the actual loss here is only the

19    government, and that would only be one victim, but the

20    commentary for (e) says that if the case involves means

21    of an identification of a victim or the theft or the use

22    or theft of such, then the definition of "victim"

23    includes any individual whose means of identification

24    was used unlawfully and without authority.  So I think

25    the guidelines are clear that this plus 2 applies.

1          And I note your objection, Mr. Krasnoo, and it's

2     preserved.

3          MR. KRASNOO:  Thank you, your Honor.

4          THE COURT:  Next, there's -- probation's assigned

5     a plus 2 for production or trafficking in an

6     unauthorized access device which I think, from

7     probation's perspective, means a Social Security number

8     or date of births.

9          I was unclear whether you agree with that, you're

10    pressing that, taking no position, or disagree?

11         MR. DiSANTIS:  Your Honor, we're not pressing it

12    from the standpoint of being consistent, we haven't

13    pressed it in similar cases, and so we're not going to

14    press it here.

15         THE COURT:  Fine.  Then on that basis I'm not

16    going to assign the plus 2 because I think it would be

17    wrong to -- I haven't had to encounter this question

18    before, but if the government is generally not asking

19    for it in this kind of circumstance, then I will accept

20    that and I will not apply that plus 2, um, enhancement.

21         You don't object to that, do you, Mr. Krasnoo?

22         MR. KRASNOO:  Not at all.  It's a pleasure to hear

23    it.

24         THE COURT:  All right.  That leads me next to that

25    probation assigned plus 2 for the conviction under --

1   for the money laundering conviction.

2        Do you agree with -- you agree with that

3   obviously, Mr. DiSantis?

4        MR. DiSANTIS:  We do, your Honor.

5        THE COURT:  Mr. Krasnoo, do you object to that?

6        MR. KRASNOO:  Under the guidelines, your Honor,

7   um, that's fair.

8        THE COURT:  Yes, I agree that that's mandatory.

9        All right, so I apply that plus 2.

10       Next, probation applied plus 2 for a supervisor

11   with respect to Mr. Gonzalez.

12       What's the government's position on that?

13       MR. DiSANTIS:  Your Honor, we agree that it should

14   apply.  Based on Mr. Gonzalez's testimony as well as the

15   other facts that we discussed yesterday, um, it's clear

16   that Mr. Cohen did direct Mr. Gonzalez, and that's

17   sufficient in and of itself for him to fit under

18   basically any of the definitions set forth in

19   3(b)(1.1)(C).

20       THE COURT:  Direct him in which sense -- in which

21   things was he directed?

22       MR. DiSANTIS:  Particularly providing him with

23   United States Treasury checks, um, having him deposit

24   those Treasury checks, having him write checks back to

25   Mr. Cohen and also provide Mr. Cohen with cash.

1          THE COURT:  And what do you say, Mr. Krasnoo?

2          MR. KRASNOO:  And I say, no, your Honor.  I'm

3     sorry.  "Supervision" means "supervision."  It's clear

4     from all the checks that were written, that there was no

5     supervision at all.  If you buy that portion of

6     Mr. Gonzalez-Pabon's testimony, then frankly from my

7     perspective you buy the testimony of a liar and he's

8     conned you as well as he's conned the world.  The fact

9     of the matter is he used those bank accounts fluidly for

10    himself after Mr. Grullon left and there was not that

11    kind of degree of supervision or control.

12         The fact that those bank accounts were opened and

13    Mr. Cohen signed on shows some degree of involvement in

14    the scheme, according to what your Honor found, and I

15    disagree with that and I dispute that.  But even

16    assuming that, that's not the same thing as finding that

17    he supervised this employee.  I mean Grullon supervised

18    him up until he left, according to what he said, and

19    then as a real matter he was on his own.  But he already

20    knew the practice and the custom and the steps to take.

21    And when he tries to shove it on Mr. Cohen, the reason

22    he does that is because he really wants to garner

23    brownie points on his deal and the government, who

24    always salivates, is trying to find a dirty attorney,

25    they're a person who's an icon target for the government

1  and has been for years and anything he can do to sweeten

2  that he believes will sweeten his own plate and his own

3  sentence.

4      THE COURT:  Fine.  Thank you, Mr. Krasnoo.

5      I should have said at the outset that each

6  enhancement, the burden of invoking any enhancement up

7  or down rests with the party seeking the enhancement and

8  the burden is by a preponderance of the evidence and

9  that's the burden -- that's what's the standard I've

10  applied on all the ones that I've already resolved and

11  obviously I apply that one here too.  This is close but

12  I'm not going to apply the enhancement and I'll explain

13  why.

14      I think the record is just not sufficiently clear

15  to meet the government's burden as to whether, um,

16  Mr. Cohen was directing Mr. Gonzalez or supervising him.

17  There's -- I mean it's plausible, I think on the record

18  here, that, um, a number of different conclusions, um,

19  one that Mr. Gonzalez was sort of operating on his own

20  after Mr. Grullon left, um, whether or not under the

21  supervision of Mr. Cohen.  The details of how the checks

22  came to Mr. -- how Mr. Cohen was providing checks to

23  Mr. Grullon, which is the essence of finding that he

24  directed him, is, um, not sufficiently clear to me, um,

25  for me to find that the government met its burden of

1   proof, um, particularly when -- that the evidence of the

2   trial was that the checks came to Mr. Cohen through

3   Mr. Grullon and I know Mr. Gonzalez spoke of both people

4   who brought those checks to Mr. Grullon and then getting

5   those checks himself from those suppliers later after

6   Mr. Grullon left.  So I'm not going to apply the 2-point

7   enhancement for a supervisor.

8        That brings us to the 2-point enhancement for an

9   abuse of a position of trust that probation applied,

10  which I believe arises from probation's perspective, out

11  of the use of the IOLTA accounts.  And I'll hear either

12  or both of you if you wish.

13       MR. DiSANTIS:  Thank you, your Honor.  For the

14  most part the government rests on its arguments in the

15  sentencing memo that it filed.

16       In essence, whether you look at this as an abuse

17  of trust or a use of special skill, Mr. Cohen fits the

18  enhancement, he clearly abused a position of public

19  trust, in this case that of an attorney, and he

20  obviously did that in a number of ways.  And I'm not

21  going to beat a dead horse on that issue, but the use of

22  the IOLTA account, the creation of fake legal documents

23  in order to show bank officials and try to justify his

24  actions such as in his discussions with Brookline Bank

25  and his assertion of the attorney-client privilege in

1    that circumstance clearly shows that he was using his

2    license in order to facilitate this fraud and conceal

3    what was in fact going on.

4        In that type of a situation, I think the trial

5    record as well as the sentencing record is clear on

6    this, um, the abuse of a position of trust enhancement,

7    um, again either from the standpoint of abusing a

8    position of public trust here or in the case of the use

9    of a special skill as an attorney in order to engage in

10   the crime is met by a preponderance of the evidence.

11       THE COURT:  Mr. Krasnoo.

12       MR. KRASNOO:  Your Honor, when I've read the

13   several cases under 3(b)(1.3) I find that a position of

14   public or private trust is a term of art.  The art

15   requires that some aspects are of the legal concept of a

16   trustee or a fiduciary.  There's nothing involved, as a

17   trustee or fiduciary, in depositing a check.  Whether

18   the check is fraudulent, whether the check is genuine,

19   has nothing to do with the fiduciary or the trustee.

20       Now there can be.  If that check belongs to an

21   actual client for whom you're doing work and there's

22   disagreement over it and the client doesn't want to

23   deposit it or he doesn't want it cashed or he doesn't

24   want you taking some money out of it, um, that's a

25   position for a fiduciary or a trustee because the way

1   you got that check from the client was in your capacity

2   as an attorney to do certain things for the client.

3        That's not what happened here.  This man was no

4   different for these purposes than Dubin Gonzalez-Pabon,

5   he was a check depositor and he was a check casher, and

6   the fact that he used his IOLTA accounts to do it does

7   not involve a special skill.  Yes, it's a special

8   account, but it's not a special skill.

9        As I read it, there must be (1) the legal concept

10  of a trustee or a fiduciary.  (2) the special skill

11  should involve substantial discretion and encompass

12  fiduciary-like responsibilities.  That comes out of the

13  Sixth Circuit which apparently is the leader in terms of

14  espousing the law in this particular area and in --

15       THE COURT:  What case was that?

16       MR. KRASNOO:  That was *U.S. vs. Humphrey* at 279 F.

17  3d 382.  That is mentioned, your Honor, I don't know

18  whether or not you have it in the final PSR, but as of

19  Paragraph 69 I submitted it as part of my total package

20  there.  And they cite for that *United States vs. Young*,

21  an earlier case, at 266 F.3d 468 at Page 475, and the

22  Tenth Circuit requires something akin to a fiduciary

23  function and they relying on *United States vs. Bronson*,

24  54 F.3d 673.

25       Now, the alleged victims in this case had no

1   fiduciary relationship with Mr. Cohen, they didn't know

2   him, they didn't bargain for his services as an

3   attorney, he didn't represent them as an attorney, so we

4   don't have that concept here in this case.  Moreover,

5   when I look at the cases that have found that an

6   attorney should properly receive the 2 points for an

7   abuse of public trust, and they're all over the lot,

8   but, um, and I cite several of them, in each of those

9   cases the attorney, um, did something in his role as an

10  attorney.

11       So in *Joline*, which is a Seventh Circuit case,

12  there was perjury by him in a corporation bankruptcy

13  concealing a potential conflict of interest.  In the

14  *Goldman* case, in the Eighth Circuit, he mishandled the

15  client's trust funds, he falsified documents of the

16  trust funds, and he lied to the bankruptcy court.  In

17  *O'Hagen* in the Eighth Circuit, reversed on other

18  grounds, he was a senior partner in a law firm in an

19  insider trading offense where he got information as a

20  result of being the partner of a law firm and used it to

21  his advantage.

22       In the *Elliot* case in the Eighth Circuit, um,

23  there was billing fraud done in his capacity as an

24  attorney when he sent out bills for the work that he had

25  done.  In *Fitzhugh*, that attorney, um, committed a fraud

offense by forming an entirely sham corporation so that

they could, um, use that to obtain loans.  In **United**

**States vs. Post**, in the Eighth Circuit, an attorney with

a fraud offense recruited participants to sham accidents

and file claims for them with insureds.

There has to be evidence that his being an

attorney significantly facilitated the offense, your

Honor, and that evidence is what's lacking here in the

case at bar.  The mere fact that he's an attorney,

without more, is not enough.

And I also point out, your Honor, in a very

interesting case from the Second Circuit, it does not

involve an attorney but I think adds some illumination

in the area, the Court rejected an abuse of trust

enhancement for a cocaine smuggler both while and after

being terminated from his position as an INS inspector

because it was insufficient evidence that the position

significantly facilitated the offense.

Now, in this case he deposits those checks into

his account, he cashes them, he takes out the money.  My

brother mentioned that he created false documents to

submit to the bank to explain and justify his conduct,

but the document that was given to the bank was a blank

form, your Honor, and he correctly said that, "I can't

give you those forms filled out by the people without

1    their consent," and that was at a time when he had been

2    duped by Grullon into believing that the persons who

3    were those checks were people who were participating in

4    real estate investments with him.  That would make them

5    entitled to a right of privacy.  And he had no business

6    turning it over unless those people agreed to

7    disseminate that information to the bank and he never

8    met them.  Those were people where Grullon was the

9    shield of those people if indeed they existed at all.

10          So I don't think it's here, your Honor.  That

11   doesn't excuse the conduct, the conduct is the conduct

12   of which he's been found guilty by the jury, and that

13   "check-cashing" that he describes it as they found was

14   money laundering and conversion of government property

15   into his own use.  But that's not the same thing as

16   using a special skill as an attorney to promote this

17   scheme.

18          THE COURT:  Yes.

19          MR. DiSANTIS:  Briefly, your Honor.

20          First of all, um, we don't agree with the fact

21   that the Sixth Circuit is necessarily the leading

22   circuit on this law.  The *Goldman* opinion that we cite

23   was written by a judge who used to be the head of the

24   sentencing commission, um, and we think that gives it

25   added weight here.  In addition to the fact that the

facts of the *Goldman* case, as well as the facts of the

*Fitzhugh* case that we cite --

THE COURT:  Was that Mazzone as I recall?

MR. DiSANTIS:  It may have been.  I don't have the

name off the top of my head.  But it's actually

discussed in one of the other opinions we cite, it's

either the Second Circuit or the Ninth Circuit, it's one

of the more recent opinions that we string-cite in our

brief.

But in any event, the facts of that case are

particularly applicable here.  In that case there was no

fiduciary duty between the attorney and the individuals

whom he was lying to for the benefit of his

co-conspirator client, he was lying to a bank that

provided his client a loan and he also lied to a

bankrupt court.

With respect to *Fitzhugh*, as Mr. Krasnoo correctly

points out, in that case the lawyer engaged in a

pass-through scheme to help both his clients and third

parties engage in a fraud.  Again there's no fiduciary

duty involved, it was the fact that the attorney in

those cases held a position of public trust that was the

centerpiece of the analysis by those two courts.

As far as the use of his position, um,

particularly with respect to the agreement to

1   participate that we discussed at length at trial, um,

2   Mr. Cohen didn't just say he can't provide these to the

3   bank --

4           THE COURT:  This was the Citizen's Bank?

5           MR. DiSANTIS:  The Brookline Bank.

6           THE COURT:  Oh, the Brookline Bank.

7           MR. DiSANTIS:  In the meetings with the Brookline

8   Bank.  He didn't just say, "I can't provide these

9   documents to you without the client's consent," he cited

10  the attorney-client privilege which, even if it did

11  exist, that's a frivolous invocation of the privilege,

12  but it's clearly a use of his position again in order to

13  either --

14          THE COURT:  If it had no effect, in other words

15  Brookline's Bank's response wasn't, "Oh, okay, you can

16  keep depositing checks," they said, "Well, we don't

17  care, stop it," can it support the enhancement?

18          MR. DiSANTIS:  Well, first of all, I wouldn't

19  agree that it didn't have any effect, my recollection of

20  the record is that they didn't tell him at that time

21  that he couldn't do it, they took whatever he gave them

22  under consideration and then came back and closed his

23  account down later on in time.  So at a minimum it

24  delayed their decision and made them think twice about

25  their decision.

1          But again I bring that up only because I -- I

2     disagree with the characterization.  I think with

3     respect to the enhancement itself, the use of the IOLTA

4     accounts, in particular when you compare it to the other

5     AD Professional accounts, which were no IOLTA accounts,

6     and you look at the activity and how long the activity

7     was allowed to continue, you can see just based on the

8     bank records and the fact of the existence of the

9     accounts and the activity going on for much more

10    substantial periods of time in the IOLTA account than in

11    the AD Professional accounts that were shut down, that

12    the fact that he was using an IOLTA account and then

13    representing to these bank officials that he was doing

14    it for legal purposes and client purposes did in fact

15    facilitate his fraud.  And so we think the record as a

16    whole supports both a position of trust and a special

17    skill.

18         THE COURT:  Do we know that -- assuming -- I think

19    you're correct that the banks shut down by and large the

20    AD accounts more quickly than the IOLTA accounts, but do

21    I know that that arose in part out of the nature of the

22    accounts as opposed to the -- I have a sense but I don't

23    really know enough based on the record here that over a

24    course of time that began before this and continued

25    after this the IRS began improving its procedures with

1    respect to United States citizens who live in Puerto

2    Rico, the filing of tax returns and following up in

3    response to some of these scams.  And so -- I mean I

4    don't know this and I don't think I'd make a finding on

5    it, but I wonder if, well, maybe in part it was just

6    more scrutiny coming to bear on some of these things and

7    the banks were more attuned to this kind of thing over

8    time chronologically and, you know, I'd know that it's

9    because of IOLTA versus other.

10          MR. DiSANTIS:  Well, I guess, um, I would say two

11   things on that point.  The first is I don't believe

12   there's any evidence about the IRS's procedures and

13   whether they improved, um --

14          THE COURT:  There was a little bit at the trial, I

15   think, but not a lot.  But I do remember it -- maybe it

16   wasn't -- you know it at least was discussed.  And maybe

17   -- and I can't remember if it came into evidence or it

18   was decided it wasn't relevant, but I thought there was

19   some discussion at least about not only how these arose

20   in terms of the use of Puerto Rican date of birth --

21   Puerto Rican identities -- identities of people who live

22   in Puerto Rico, but I thought there was something about

23   some changes by the witness at the end, yet I don't

24   remember her name now.

25          MR. DiSANTIS:  Victoria O'Brien.  Ms. O'Brien.

1          THE COURT:  I think so.

2          MR. DiSANTIS:  I think it's her.  And there very

3     well may have been.

4          What I would say though is I think that supports

5     our argument, because if you look at when the activity

6     occurred in the AD Professional accounts, um, in

7     Citizen's Bank, that was in the summer of 2012, I

8     believe, at People's Bank, that was in January of 2013.

9     The IOLTA account activity, while it did occur before

10    the summer of 2012 in the, um, Brookline Bank and the

11    Century Bank accounts, continued well longer, I think,

12    after, um, the -- the accounts for AD Professional.

13         So in other words, the AD professional accounts, I

14    think, preceded a lot of the IOLTA account activity.  So

15    if the IRS did improve their procedures, it's not

16    showing up in, I think, the, um, the IOLTA accounts as

17    opposed to the regular AD Professional accounts.

18         THE COURT:  Weren't all the IOLTA accounts first

19    by and large?

20         MR. DiSANTIS:  The activity in, as I said, the

21    Brookline Bank and Century Bank accounts, that activity

22    did start prior to the AD Professional account activity.

23    Citizen's Bank, I think, happened after that, I think

24    that happened in that March through May or late April

25    2013 time period.

1          My point is, your Honor, that the AD Professional

2     account activity, while it started after two of the

3     IOLTA accounts, existed for a shorter period of time

4     than the IOLTA account activity that continued from the

5     date of the opening of the AD Professional accounts did.

6     So if the IRS procedures improved, they didn't have any

7     effect on the IOLTA account activity presumably.  And so

8     I don't think that has any -- that doesn't really factor

9     in here at least based on the bank activity and the

10    evidence of that that's in the record.

11         MR. KRASNOO:  There's a couple of things to point

12    out to your Honor.  The first is that at least one of

13    the two Enterprise Bank accounts was opened February

14    5th, 2012 and closed May of 2013.  A second Enterprise

15    Bank account was opened March of 2013 and closed in May

16    of 2013.  But at least one of them was one year and

17    three months.

18         The Bank of America accounts, your Honor, moreover

19    had less -- more checks in it for a shorter period of

20    time, approximately 90 checks, than the Citizen's Bank

21    and than the, um, Century Bank when they started, your

22    Honor.  So that I think that, um, even without having

23    sufficient information as to whether or not the tax

24    scrutiny of these accounts improved with regard to

25    finding the, um -- the checks that involved false tax

1    refund checks, the fact of the matter is that in this

2    case, um, the -- the, um, Brookline Bank, um -- sorry.

3    Let me finish the thought on that.  That the, um -- that

4    there was huge activity in the Bank of America, even if

5    it was for a shorter period of time, and that still

6    necessarily didn't come to the bank's attention until

7    when it did and they closed it.  It may have been a

8    shorter period of time, but there was heightened

9    activity there on the part of Mr. Gonzalez-Pabon.

10          The other thing I want to point out, your Honor,

11   is my brother said he's correct that the Brookline Bank

12   closed the account after it discovered the problem, but

13   what he doesn't tell you, however, and the evidence did

14   come out at trial, that Brookline Bank immediately froze

15   the account so that no further activity could go in it,

16   upon identifying the problem, then they later closed it.

17   But it couldn't be used during that window of time, from

18   the time of finding it to the time of closing it.

19          THE COURT:  Yes.

20          MR. DiSANTIS:  Your Honor, just two brief points,

21   they're really the same point, but two pieces of

22   evidence for you to consider.

23          The first is that in the affidavits that Mr. Cohen

24   admitted on the stand at trial that he created, he's

25   saying that the clients, in that case Ms. Quinones,

1    provided the Treasury check that he was trying to get

2    Brookline to accept, which they ultimately didn't but he

3    later deposited it into Sun Trust, um, that she was

4    giving it to him in order to negotiate his part of that

5    transaction, um, and that he was authorized to do so.

6         The other thing that I would note is that the

7    agreement to participate that was admitted into evidence

8    at trial states that Mr. Cohen was a participant in

9    taking client funds for real estate investments, it

10   references his name, "David Cohen, Esq." specifically,

11   and that's an agreement that he drafted, he created, for

12   the purposes of again trying to convince Brookline to

13   deposit that, um, check from Ms. Quinones.  So I would

14   just submit those for further consideration by the

15   Court.

16        THE COURT:  Thank you.  I just want to talk to

17   probation for one minute on this question.

18        (Pause.)

19        THE COURT:  Thank you.

20        I'm not going to apply the enhancement for two

21   reasons.  First, with respect to the documents, the

22   affidavit agreement to participate and the like, I don't

23   find those substantially facilitated, within the meaning

24   of the guideline, the offense because I don't think that

25   the banks, they didn't rely on them, they didn't accept

them, and, um, whatever effect it had on them, it

certainly didn't rise to "substantially facilitate."

     With respect to the use of the IOLTA accounts,

which is the gravamen of the argument for the

enhancement, both from probation's thinking and the

government, I don't think the IOLTA accounts really

were, um, trust accounts in that sense.  I don't think

that he used them.  It may be that Mr. Cohen thought

that he would get more leeway or it may be that the

other co-conspirators thought that, but I don't think

that the banks really, um, treated it any differently or

at least differently enough to substantially facilitate

the commission of the offense.

     Insofar as there's sort of a separate special

skill theory, um, I think the special skill theory, to

the extent it's the documents, didn't substantially

facilitate for the same reason to the extent its use of

the accounts.  I don't think that use of the accounts

alone is a special skill.

     There was an unpublished -- I think it's a Sixth

Circuit case, *Weissberg*, in which a lawyer was, um, also

with the IRS, but a different kind of case, he was

filing his tax returns but not paying and socking away

large amounts of money in his IOLTA account, hiding it

from the IRS, and claiming poverty, that he couldn't

1  pay, and the Court of Appeals affirmed that it was a

2  special skill analysis only that this special skill

3  didn't apply.  He was just using it like an account.  So

4  I'm not applying that enhancement.

5      Next, probation did not apply but left for me to

6  consider the question of whether to apply the

7  enhancement for obstruction of justice arising out of

8  Mr. Cohen's testimony at the trial.

9      And I think you do advocate for that, right?

10      MR. DiSANTIS:  We do, your Honor.

11      THE COURT:  All right, I'll hear you.

12      MR. DiSANTIS:  Thank you.

13      Your Honor, if there is a case to apply this

14  enhancement, where the defendant testifies, this is the

15  one.  Your Honor said yesterday, um, when we were

16  discussing the banks and this story that Mr. Cohen told

17  them, um, do we really -- in essence he suggested it, do

18  you really think they believed it?  Well, your Honor,

19  that same farce was reiterated under oath by this

20  defendant during the trial on multiple occasions both on

21  direct examination and on cross-examination.  That story

22  was false, Mr. Cohen never believed it, the evidence

23  shows that he didn't, and by at least a preponderance

24  that's been proven.

25      In our sentencing memo we cite just some of the

1    instances where Mr. Cohen lied on the stand.  Obviously

2    the first of those instances was when he said that he

3    believed that story at the time, that these were

4    clients, were prospective clients whose money was being

5    invested in real estate.  He said at times some of them

6    were, but he said he believed that story.  That was not

7    the case.  The evidence shows that.

8         With respect to his testimony that he didn't lie

9    to People's United Bank, that he disputed Mr. Sawyer's

10   testimony, um, that also is a lie --

11        THE COURT:  "Sawyer's" the officer, the retired

12   officer from Maine or is he a bank?

13        MR. DiSANTIS:  I believe he was a retired officer.

14        THE COURT:  He's the one from the --

15        MR. DiSANTIS:  Yes, your Honor, I think that's

16   right.

17        THE COURT:  All right.

18        MR. DiSANTIS:  He did lie to him and the evidence

19   showed that.  He opened the account.  Mr. Cohen also

20   testified that he did not know that Mr. Grullon was

21   going to be depositing United States Treasury checks

22   into that account, yet he had opened a Citizen's Bank

23   account for -- AD Professional, for that exact purpose,

24   and he himself had been for, at that point over a year,

25   depositing these Treasury checks into his account at his

own behest and at the behest of Mr. Grullon.  That also
is a lie.

And one more example of that, and probably the
most egregious, and I think the testimony that tells
you, your Honor, that there's no way he ever believed
this story, and that is this testimony about these 30 to
40 licenses that Mr. Cohen says he had in his car and
that he says were stolen when his car was stolen in
December, December 1st or December 2nd of 2012, in the
middle of all of this?  That is patently absurd,
patently false, and the Court should not accept the "dog
ate my homework type of defense" in this case.

The facts make clear he never had anything beyond
the six or seven copies of fake counterfeit licenses
that he had and that he submitted into evidence in this
case.  He didn't have them for the 13 checks between the
date of this purported theft and the date of the first,
um, license -- or the date of the check relating to the
first license that he produced, he didn't have them for
any of the checks after March 9th, for the period of
March 9th through April 27th when he was depositing more
Treasury checks after he had already been kicked out of
two different IOLTA accounts at that point, he never had
them, and that was a boldfaced lie.

Again, if this enhancement is ever going to be

1    applied in this case like this -- and it should be

2    because if somebody gets up there and lies, other

3    defendants need to understand that if you want to get up

4    there and defend yourself in a truthful, honest manner,

5    you can do it and you're not going to be punished for

6    it, but if you get up there and lie through your teeth,

7    particularly in a case like this, particularly when

8    you're an attorney, you should get an extra punishment

9    for that.  Mr. Cohen deserves it here and we'd ask that

10   you apply it.

11        THE COURT:  Thank you.

12        Mr. Krasnoo.

13        MR. KRASNOO:  Your Honor, I was thinking about

14   this one on the way down today.  I find one of the

15   ironies is that the defendant takes the stand, he tells

16   his side of it, there's an instruction as to willful

17   blindness, why is such an instruction given as opposed

18   to an instruction just to "judge the credibility, ladies

19   and gentlemen of the jury, and decide which side is

20   telling the truth"?  It's given because it's believed

21   that if a defendant has red flags in front of him but

22   doesn't recognize the red flags, the jury is entitled to

23   determine whether or not he's willfully blind.  And you

24   gave that instruction and you gave it at the

25   government's request and the government submitted an

1    instruction on that.

2         But you sort of can't have it both ways.  If he's

3    blind, that means he believed what he was saying to this

4    Court and someone said, "Somehow magically you should

5    have seen the truth, you didn't, you were blind, and you

6    were convicted of this offense," and that's okay, that's

7    what happened.  But then they're saying, now, "Oh, you

8    weren't blind, you took the stand and you lied, you

9    concocted a whole story that isn't true."  Well, if

10   that's so, why do you give a willful blindness

11   instruction?  It's not necessary to decide that on the

12   issue of credibility.  You did it because Mr. Cohen told

13   you that what he was guilty of was check-cashing.  To

14   this day that's what he believes he was guilty of,

15   check-cashing.  Now I understand the jury found

16   differently, I understand the government feels

17   differently, but that doesn't mean he, under oath,

18   wasn't telling it to you the way he saw it.

19        Now, the government might not like those answers

20   and it may not have liked what he said, but that's not

21   the same thing as finding that that was not true when he

22   said it.  And his testimony in the eyes of the jury may

23   have made him a damned fool, but that's not the same

24   thing as finding that he's a damned lying fool or a

25   damned truthful fool.  A fool he remains.  I don't

believe that it is fair to jack on 2 points claiming

that, "Well, anyone who's willfully blind therefore must

be lying and concocting the story," and I don't think

that's fair and I don't think it's applicable in this

case.

THE COURT:   Thank you.

I'm going to apply the 2-point enhancement and let

me explain why.

First, I don't think the willful blindness

instruction, just so we're clear, is mutually exclusive

with the credibility and other determinations to which

you refer.   Second, I don't think this is a case merely

of a person who testified at trial, who talked about the

facts that were raw facts that there wasn't much dispute

about, for example, that checks were deposited in the

IOLTA account or checks were cashed, and disagreed and

said, "I didn't have the intent, I didn't understand,"

um, and the evidence ultimately in the jury's view was

that he did.   That may be part of this case, but that's

not all, in terms of the testimony, and if that's all it

was it would be a closer question as to whether the

enhancement applies and the argument you make would be

more on point, Mr. Krasnoo.   But I think there are other

things independent of that that warrant the 2-point

enhancement.

1          First, I agree wholeheartedly with Mr. DiSantis

2     that the story, which is charitable in my view, about

3     the stolen car explaining the absence of a driver's

4     license and other identification documents was just

5     concocted.  It -- I just don't believe it.  It didn't

6     even explain what Mr. Cohen was saying in testifying.  I

7     had all the -- my recollection is that I had all the

8     driver's licenses and other documents for the checks I

9     was trying to cash except all the ones that were, um,

10    the ones up to December 2012, was it?  "December 2012

11    they were in my car and my car was stolen and the papers

12    were in the car and I lost those papers," but, um, that

13    would then suggest that doesn't explain why that he

14    wouldn't have those documents for all of the checks in

15    early 2013 that he cashed.  And so I find that story,

16    um, not only not credible, but it's self-sufficient to

17    support the enhancement.

18         Second, I think the interaction that, um, the bank

19    security officer from People's Bank, who we've referred

20    to, I think, his name was "Sawyer," but was a retired

21    police officer from Maine now working for People's Bank

22    was very -- he's the officer -- or the retired officer's

23    testimony was very careful, very scrupulous, and his

24    investigation was very meticulous, and he recounted

25    interactions with Mr. Cohen in which Mr. Cohen lied to

1     him, um, and those interactions don't support the

2     enhancement because they did not happen at the trial,

3     they were beforehand, and that's not what the government

4     is asking for the enhancement based upon.  But Mr. Cohen

5     recounted those interactions and testified about his

6     interaction with Mr. Sawyer at the trial and I found

7     that his testimony was untruthful and incredible there.

8          And here this is a third independent reason, I

9     think, that supports the enhancement, which is that, um,

10    there may well be, as you point out, Mr. Krasnoo, cases

11    in which someone says, "I didn't get this, I didn't

12    think it was fraud," and the jury found fraud, and the

13    enhancement would be inapplicable.  And I agree that

14    there are circumstances where that might be the case.

15    But this is not that case.  It's not that case for a

16    number of reasons.

17         He not only denied knowing that the checks were

18    fraudulent, but there was a series over a period of time

19    of (A) it was blatantly fraudulent from the get-go, and

20    that Mr. Cohen, by his own testimony, one thing I do

21    believe, was that he said at the very beginning -- not

22    at the first check but within the first number of

23    checks, that he agreed to be paid for it and take money.

24    And, um, there was no good reason for somebody to be

25    paying him a fee for cashing these United States

1    Treasury checks.

2       United States Treasury checks are good as gold in

3    all circumstances but one and that one circumstance is

4    when someone shows up at your door with a whole pile of

5    U.S. Treasury checks made out to a whole pile of

6    different people, then each individual check might be

7    good as gold, but they're flashing like a neon sign that

8    there's a problem here, and especially when you're not a

9    bank and you're not a check-cashing business.  And there

10    was really no reason to take a fee for this tiny amount

11    of work he was doing and it was utterly inconsistent

12    with his general billing behavior over 30 years as a

13    lawyer that's described in all the letters.

14       And then he was told by the Century Bank people

15    basically it was fraud and he went and continued it at

16    Brookline and then he was told by the Brookline Bank

17    people and he went to People's Bank and then he was

18    confronted by an officer, um, not an officer then, but

19    the bank security officer.

20       So on balance, on all those reasons I find that

21    the enhancement applies and I assess the 2 points for

22    obstruction because that's what the guidelines, under

23    the law and the facts, support.

24       MR. KRASNOO:  And note my objection, your Honor.

25       THE COURT:  I note your objection, Mr. Krasnoo.

1          MR. KRASNOO:  Let me just point out that some of

2     the facts which you reply upon I don't believe are

3     correct on the record.  It wasn't all checks that he got

4     for which there were licenses, your Honor, there were

5     only some.  And secondly --

6          THE COURT:  I didn't say -- I didn't mean to

7     suggest that all of the checks that he got did he

8     receive licenses for, nor did I mean to suggest that his

9     testimony was that he had received licenses for all the

10    checks.  What he testified to, to my recollection, is

11    that at some point in time he began asking for the

12    licenses, he didn't testify he had a whole -- I forget

13    if it was 30 or 40 licenses, that those licenses he did

14    not have at the trial because his car was stolen, but

15    his car was -- the police report showed, and as he

16    testified, was in fact stolen in December of 2012, he

17    produced a handful of licenses and documentation from

18    early in 2013.  But that there were other checks in 2013

19    and for those he did not have the licenses and he did

20    not have an explanation, is my recollection.  So that's

21    what I refer.

22         MR. KRASNOO:  That's correct.  And I'd simply

23    point out that if it was fraudulent and those were

24    fraudulent when made, he would have had them all in

25    place by the time of the trial to be sure.

1          The second thing I want to point out is your Honor

2    said --

3          THE COURT:  I appreciate that, but one thing I've

4    learned here in cases is just because somebody commits a

5    crime doesn't mean they do it wisely, intelligently, or

6    with savvy, oftentimes we see people commit crimes

7    stupidly in ways in which they're definitely crimes, but

8    they're going to commit it and you look at it and say

9    "Well, they're going to get caught," but they do it and

10   it doesn't mean they didn't commit the crime or didn't

11   know it at the time.  So I take your point but -- go

12   ahead.

13         MR. KRASNOO:  I do want to point out, your Honor,

14   that your Honor said Century Bank told them it was fraud

15   and they did not, they told him it was check-cashing and

16   it was not permitted at the bank.  Okay?

17         THE COURT:  Fair enough.  I think the conclusion

18   and my point there was that the inference can be drawn

19   from what each of those banks told him, when they

20   refused to accept any more of these checks in his

21   account, was to stop it and that there was a big problem

22   and it was fraud.

23         All right.  Are there other -- well, that leaves

24   us at, I believe, am I correct, the guideline offense

25   level -- the guideline offense calculation at 28.

 1          All right.  Do you both agree with that subject to

 2    your objections?

 3          MR. DiSANTIS:  We do, your Honor.

 4          MR. KRASNOO:  I need to add it all up, your Honor.

 5          (Pause.)

 6          THE COURT:  I can go over it with you, if you

 7    wish, Mr. Krasnoo.

 8          MR. KRASNOO:  Well, I've got down that it was 6

 9    and then 16, um --

10          THE COURT:  Plus 2 for victims, plus 2 for money

11    laundering, plus 2 for obstruction, a total of 28, if I

12    did my math correctly.

13          MR. KRASNOO:  (Pause.)  Yes, your Honor.

14          THE COURT:  All right.

15          Are there other objections, before we get to

16    departures or variance, that I need to resolve for the

17    government?

18          MR. DiSANTIS:  Not from the government, your

19    Honor.

20          THE COURT:  All right.

21          Mr. Krasnoo, any for you?

22          MR. KRASNOO:  I don't believe so, your Honor.

23          THE COURT:  All right.  Fine.

24          Then before we turn to departures and variances, I

25    just have a couple sort of related questions.

1          One is, um, is there objections, Mr. Krasnoo, to

2     the preliminary order of forfeiture and the motion for

3     order of forfeiture filed by the government yesterday?

4          MR. KRASNOO:  Yes, your Honor.

5          First, he's not the real party in interest, the

6     property belongs to Tanya Ramirez.  Secondly, we've

7     maintained all along that it is not $160,000.  We

8     demonstrated that at the trial.  He testified as to what

9     the amount was.  The government has never changed the

10    amount and he claims that it's 160.  If the government

11    gets the 160, that would be a windfall.  But since it's

12    not his property, he's relatively indifferent to that,

13    your Honor, and the true party in interest, Ms. Ramirez,

14    is the one who should be arguing it to you.

15         MR. DiSANTIS:  Your Honor --

16         THE COURT:  To the extent Ms. Ramirez has a

17    legitimate interest and wishes to advance it, she has an

18    opportunity, the preliminary order of forfeiture doesn't

19    actually take the property.

20         MR. DiSANTIS:  That's right, your Honor.

21         My understanding of the process is, first of all,

22    the issue is whether or not something was purchased with

23    proceeds of the crime.  Here I think we've established

24    that, um, at least by a preponderance, as we're

25    required.  And secondly, um, when the order of

1   forfeiture has been entered in the forfeiture

2   proceeding, um, particularly the execution when it

3   relates to property, once that happens there is an

4   opportunity for stakeholders to submit their interests

5   and what their interest is and to challenge the

6   forfeiture if they so choose.  That's my understanding

7   of the process.

8           THE COURT:  All right.

9           Then I allow the United States's motion for a

10  preliminary forfeiture, Docket Number 189, Maria has

11  signed the preliminary order of forfeiture.  I note your

12  objection, Mr. Krasnoo.

13          And, um, the $160,000, which is in the motion

14  for -- where does that come from?

15          MR. DiSANTIS:  Your Honor, I believe that that

16  amount comes from the amount that probably was put

17  towards the property, um, and then in addition to, um,

18  an amount that was part of the counts of conviction.  I

19  would say this, I believe that Mr. Cohen is in fact,

20  from a forfeiture standpoint, on the hook for over $1.6

21  million.  There's case law out there, um, that's

22  recently been cited in two First Circuit appeals by the

23  government that supports the fact that even relevant

24  conduct, um, can lead to forfeiture.  So here we could

25  be seeking the 1.6 million.  But my understanding is the

1    160, at the very least, is a combination of whatever he

2    put towards the property plus checks that are referenced

3    in the indictment.

4         THE COURT:  All right.  I'll allow then the motion

5    for order of forfeiture, money judgment, Docket 190, and

6    I've signed the order of forfeiture, money judgment.

7         Your objections are noted, Mr. Krasnoo.

8         MR. KRASNOO:  Thank you, your Honor.

9         THE COURT:  You're welcome.

10        That leads me to one other question.  Which is the

11   presentence report referred to an IOLTA account that

12   Mr. Cohen has with $290,000 in it.  Do you know anything

13   about that?

14        MR. KRASNOO:  What I know about that, your Honor,

15   is that's clients funds for real estate stuff.  It

16   doesn't belong to him.  It's not his money.  He can

17   explain that.

18        THE COURT:  All right.

19        Does the government have any view about this?

20        MR. DiSANTIS:  Well, I think ideally, your Honor,

21   the government would like proof that it's not, um, his

22   money and that it's -- you know that there be some sort

23   of a showing by him that these are in fact client funds.

24   That should be relatively easy to do if this IOLTA

25   account was kept as IOLTA accounts are supposed to be

1    kept in that there is a client ledger, there is some

2    documentation.  But if the defendant is not able to

3    provide proof, that should be something that should be

4    -- that we would definitely go after as part of any

5    restitution order of forfeiture.

6         (Pause.)

7         MR. KRASNOO:  Your Honor, my client informs me

8    that $280,000 was sent to --

9         THE COURT:  280 or 290?

10        MR. KRASNOO:  Um, the amount in the client's fund

11   account was 290.  280 was wired back to the client.

12   Okay?  After your Honor told him that he could not

13   practice law and carry on the transaction, $10,000 was

14   wired to an attorney.  (Pause.)  I'm sorry, a check was

15   sent to an attorney.

16        THE COURT:  All right.

17        MR. KRASNOO:  So that there's nothing left in the

18   account and there shouldn't be if it's not his money.

19   They can document that if they want.  The government

20   apparently has no trouble getting bank records whenever

21   it wants, your Honor, so it can certainly get bank

22   records there.  As far as my client being under the

23   obligation to provide an explanation, he just did, and

24   now they could go to the bank and find out whether or

25   not those things happened with regard to the 290,000.

1      MR. DiSANTIS:  We'd asked that he be placed under

2  an obligation to provide support for this.  It should be

3  relatively easy for him to do and, considering the

4  circumstances, we think it's warranted.

5      THE COURT:  Well, I think that -- as a practical

6  matter there's this, at the end of these proceeding I'm

7  going to be entering a judgment of restitution in favor

8  of the Internal Revenue Service which is going to well

9  exceed the $290,000, I think it's going to be in the

10  neighborhood of $1.6 million.  And so the government,

11  unless I'm wrong, is entitled, I think, in pursuing

12  restitution to take discovery to see about where assets

13  are.

14      Is that your recollection, Mr. DiSantis, if you

15  know?  I know that's not what you do.

16      MR. DiSANTIS:  I don't know the answer to that,

17  um, off the top of my head, I don't.

18      THE COURT:  Well, I --

19      MR. DiSANTIS:  Mr. Merritt reminds me that we are,

20  um, entitled to take discovery.

21      THE COURT:  Yes, I would think you are.

22      So it seems to me that the wise thing to do for

23  Mr. Cohen would be to -- because it would be simpler and

24  quicker than facing document requests and the like, is

25  to provide the information about that $290,000, the

1    source and the disposition, and rather than go through

2    the depositions or interrogatories and document requests

3    and the like.  And, um, if it's a simple explanation

4    that there was a client transaction, the client says, "I

5    gave him money to do something and then he couldn't do

6    it because he couldn't practice law anymore and so he

7    returned the money to me or other counsel," then that

8    should be pretty simple to clear up.  So I would suggest

9    that he do it.

10         MR. KRASNOO:  I disagree with you.  It's pretty

11   simple to ascertain, but the government's healthy

12   suspicion is never going to accept that and therefore

13   they will go to the bank and see if those documents

14   exist anyway.  So it's coming back to the same thing.  I

15   will check with my client and see whether or not he's

16   willing to impart the information to the government so

17   that the government, once again, can claim that he's

18   engaging in some kind of obstruction of justice or

19   perjury.

20         THE COURT:  Where was the IOLTA account?

21         (Pause.)

22         MR. KRASNOO:  Century Bank.

23         THE COURT:  Is this the same Century Bank IOLTA

24   account that was -- to which there were deposits years

25   before?

1          MR. KRASNOO:  That's correct.

2          THE COURT:  All right.

3          (Pause.)

4          THE COURT:  What do you want me to do?

5          MR. DiSANTIS:  Your Honor, we would ask that he be

6    ordered to provide evidence of the wiring and also

7    evidence of the check.  It should be something that he

8    can -- it should be something that's reflected on his

9    bank statements.

10         THE COURT:  Well, do you want it from him or do

11   you want it from Century Bank?

12         MR. DiSANTIS:  We'd like it from him in the first

13   instance.

14         THE COURT:  All right.

15         Any reason I shouldn't do that?

16         MR. KRASNOO:  Yes, the reason is very simple.  If

17   the government doesn't like the answers, again they'll

18   come back to your Honor or they'll charge him with

19   perjury.  Anything that comes out of his own mouth or

20   his own actions is subject to the government's blatant

21   disregard for whether it's true or not, they want to go

22   after him, and they'll go after him.  On the other hand,

23   if they get it from the bank, this federal government,

24   at least this district, doesn't go after banks for all

25   of their wrongdoing, as far as I can tell, and therefore

1    if they get it from the bank and it's the identical

2    information as to what they're looking for in his bank

3    statements --

4         THE COURT:  Mr. Krasnoo, I have to move on with

5    the sentencing.  If you want to request an order, since

6    it's in some technical sense premature because I haven't

7    entered the order of restitution yet, ask for it and

8    then we can discuss it.

9         MR. DiSANTIS:  Thank you, your Honor.

10        THE COURT:  All right.

11        All right.  Are there departures as opposed to

12   variances you're seeking?

13        MR. KRASNOO:  I can't really answer that, your

14   Honor, I have to admit to a huge defective knowledge

15   between variances and, um --

16        THE COURT:  So do you want me to just hear you

17   once on --

18        MR. KRASNOO:  Excuse me?

19        THE COURT:  Do you me to hear you once with

20   respect to departures and variances?

21        MR. KRASNOO:  Sure.

22        THE COURT:  All right.  Then I'll hear from the

23   government first, then I'll hear from you, and then I'll

24   give Mr. Cohen the chance to allocate if he wishes.

25        MR. KRASNOO:  All right.

1        MR. DiSANTIS:  Thank you, your Honor.  My

2   understanding is that --

3        THE COURT:  No, you know actually what I should

4   do?  I'm sorry, before you begin I should do one thing,

5   both so we're all on the same page and so I have it

6   correctly as well.

7        So with an offense level of 28, do you both agree

8   he's criminal history category 1 with 0 criminal history

9   points?

10        MR. DiSANTIS:  We do, your Honor.

11        MR. KRASNOO:  That's correct.

12        THE COURT:  All right.  So that puts him at a

13   range of -- under the guidelines of 78 to 97 months.

14        Still 1 to 3 years of supervised release, right?

15        PROBATION OFFICER:  Yes, your Honor.

16        THE COURT:  Um, ineligible by statute for

17   probation.  And a fine range --

18        Does the fine range change?

19        PROBATION OFFICER:  Your Honor, the fine range

20   does change, it would be, um, $12,500 to $500,000.

21        THE COURT:  All right.  Okay, the fine range and

22   restitution remain the same at $1,672,958.74 and the

23   special assessment, the same, at $1600.

24        Subject to your earlier objections about my

25   calculation, Mr. Krasnoo, do you agree with all of that?

1          MR. KRASNOO:  I do, your Honor, and of course,

2     yes, I do object to the calculation.

3          THE COURT:  Oh, yes, I know.

4          MR. KRASNOO:  And basically I also object to the

5     amount of money, the 1.6.

6          THE COURT:  Well, that's preserved, you objected

7     to that already.

8          All right.  Go ahead, Mr. DiSantis.  Sorry about

9     that.

10          MR. DiSANTIS:  Thank you, your Honor.

11          Your Honor, the government recommends a sentence

12     of 84 months of imprisonment, 3 years of supervised

13     release, to include conditions that the defendant both

14     not practice law nor not seek reinstatement to the bar

15     during that time period.  We would also ask for a

16     condition that he, um, affirmatively renounce and give

17     up his appointment as a notary in the Commonwealth of

18     Massachusetts.  We're seeking no fine.  Restitution in

19     the amount of the loss, which here is over $1.6 million.

20     And a special assessment of, I believe, $1600.  Thank

21     you.

22          As for the reasons, your Honor, I'd like to talk

23     about the seriousness of the offense, the

24     characteristics of this defendant, as well as what

25     constitutes just punishment and what promotes respect

1    for the law, because the government believes that these

2    are the prominent Section 3553(a) factors in this case.

3        First, the seriousness of the offense.  And I'm

4    not going to belabor the points we've already been

5    through with respect to the guidelines calculation and

6    what the guidelines considers important, but I'd like to

7    focus on two aspects of Mr. Cohen's crimes that the

8    government believes are particularly egregious and I

9    think support the type of sentence the government is

10    seeking here, which is in essence 7 years and a middle

11    of the guidelines range sentence.

12        First of all, the level of deliberation that was

13    involved here was very significant, and we talked about

14    this in our sentencing memo.  But this is an individual

15    who engaged in this conduct for a period of years, he

16    engaged in the conduct for about 18 months in his IOLTA

17    accounts and then he continued, as part of the

18    conspiracy, for a substantial period of time working

19    through -- kind of with Mr. Gonzalez and at times

20    Mr. Grullon in order to engage in this check-cashing,

21    theft of government property and money-laundering

22    scheme.  You can see that clearly through the evidence

23    submitted at trial.

24        This is someone who, when he was closed out of

25    Century Bank -- and irrespective of the reason, when he

 1   was closed out for the type of activity he was doing, he

 2   just moved on to Brookline Bank.  When he was confronted

 3   by Brookline Bank, what did he do?  Well, he provided

 4   false documentation and he moved on to another bank.

 5   And even after he was -- or around the time he was

 6   working in that bank, he took the check, Ms. Quinone's

 7   check, which he had tried to deposit in Brookline and it

 8   had been denied, he found another account to deposit

 9   that in.  And then he continued in the conspiracy after

10   that and he's trying to blame that activity on

11   Mr. Gonzalez and Mr. Grullon.  And I'll get to that in a

12   little bit.  But that level of deliberation is

13   significant.

14        And while all white collar crimes involve some

15   level of deliberation, in the greater scheme of these

16   cases that's pretty significant deliberation and it's

17   also pretty blatant and brazen conduct in the face of

18   some of the confrontations that Mr. Cohen was dealing

19   with when it came to these accounts.  So the level of

20   deliberation is significant and warrants a serious

21   response.

22        The other thing that I'd like to -- the other

23   point that I'd like to make under "seriousness of the

24   offense," which your Honor has not taken into account as

25   part of the guidelines, is the way that Mr. Cohen used

1    his status as an attorney and his law license.

2         Now, under 3553(a) the guidelines analysis does

3    not apply, so you can consider this, your Honor, and you

4    should.  Mr. Cohen used his IOLTA account and it's clear

5    he used his IOLTA account in order to hide what he was

6    doing and facilitate what he was doing.  He didn't just

7    use one of them either, he used three, and after he'd be

8    shut out of one, he'd move on to the other.  That's very

9    significant.

10        He used his law license when he was sitting in the

11   room with these bank officials being questioned.  He

12   used it with Bill Keefe when he was sitting in the room

13   with him at Century Bank in September of 2012 by telling

14   him he had these clients, prospective clients who wanted

15   to buy property.  Again, false.  Using his position as

16   an attorney representing clients to try to justify

17   federal criminal activity.

18        He used it when he was in the room with Brookline

19   Bank officials when he handed them that agreement to

20   participate which had his name on it, "Esquire," saying

21   that he was the one who was going to be accepting this

22   money for investments and then investing the money in

23   property transactions, he was the one, not Mr. Grullon,

24   not Mr. Gonzalez, "R. David Cohen, Esq.," or "David

25   Cohen, Esq.," whatever the document says about it.

1     Again that's a clear use of his license.

2          He used it again when it came to the affidavit of

3     Ms. Quinones saying that -- according to the affidavit,

4     again that he drafted, just like the agreement to

5     participate that he admitted he drafted, that he was

6     going to be depositing this with her consent, you know,

7     on her behalf.  Not what he was doing.  A boldfaced lie,

8     hiding behind his license, and using that license as

9     both a sword and a shield in this case in order to

10    further that fraud.

11         He also used it again and he used the fact of

12    being a notary to notarize those false endorsement forms

13    that you saw at the sentencing in this case for

14    Santander Bank, the ones that Mr. Gonzalez testified

15    about.  Again, United States Treasury checks just like

16    the other ones.  Here he's trying to, again, like the

17    affidavit, prove to a bank that this individual is

18    allowing this third-party deposit, um, into the account

19    and they're doing it on behalf of the payee, and he

20    notarized it to make it seem like this was real, and it

21    wasn't.

22         So, your Honor, again there were numerous aspects

23    of Mr. Cohen using his license, using the fact of being

24    an attorney, using his attorney trust accounts, in order

25    to engage in the fraud, to cover it up, and to further

1    it.  And we believe that should be taken into account

2    under Section 3553(a) when it comes to the seriousness

3    of the offense.

4         And finally there's the harm that he caused and

5    here it's significant, it's $1.6 million.  Obviously

6    this isn't a Madoff ponzi scheme, but that's a

7    significant amount of funds, it's a significant amount

8    of money taken from the public and being basically used

9    for both his benefit and the benefit of his

10   co-conspirators.

11        And his take was not insignificant.  Your Honor

12   saw -- again he was operating in cash so you can't trace

13   everything that he took.  He testified that he took 10

14   percent.  We know that's false.  What we do have that we

15   can trace, in every instance he took more than 10

16   percent from those checks, he took between, I believe,

17   12 percent and 88 percent, depending on the checks, and

18   they turned out to be a lot closer to the 88 than they

19   did to the 12 on the average.  So again the harm here is

20   significant and that should be taken into account when

21   it comes to the seriousness of the offense.

22        With respect to Mr. Cohen's personal

23   characteristics and history, your Honor should obviously

24   take that into account.  He's received a large number of

25   letters in support.  He obviously has a lot of support

1    in the audience today, he did yesterday, and that's

2    something that the Court should consider.  I would just,

3    um, suggest this, when the Court is considering those

4    letters and the support.

5         With respect to the letters, I read most of them

6    and what I saw were people who he had done some sort of

7    service for through his attorney practice, either

8    cutting them a break on a fee, helping them out with pro

9    bono legal work, or doing something to benefit them, and

10   that is good and that's something that's positive and

11   it's a positive aspect of what Mr. Cohen has done in his

12   life, but these are not people who knew, at least

13   according to the letters, anything about the facts in

14   this case.  They didn't know that for about three years

15   he was engaged in this theft scheme and this money

16   laundering scheme, they had no idea about that.

17        And it also, I think, on the whole -- and again I

18   don't want to take anything away from the letters, but

19   these are from individuals who knew him through his work

20   as an attorney as opposed, for the most part, to people

21   who were close to him and who knew him very well.  And

22   so I think those are just factors that the Court should

23   be taking into account, because I'm sure it does in

24   every case when it reads a letter, they should all be

25   given weight and all be given significant weight, but I

1    think it's important to keep those facts into account.

2          And also to keep in mind that it may be that the

3    reason Mr. Cohen was able to cut somebody a break on a

4    legal fee or do something pro bono was because he was

5    putting cash in his pocket for three years and a

6    significant amount of it during the relevant time in

7    this case.  And so I would just ask the Court to

8    consider that when the Court is thinking about this.

9          Also, when it comes to criminal record, again

10   Mr. Cohen doesn't have any and that should obviously be

11   factored in, but he engaged in this conduct for about

12   three years and that's a long time to engage in any sort

13   of criminal behavior consistently, and in the blatant

14   way that he did it the government suggests that that

15   fact is important to consider and also says something

16   about somebody who may have no criminal history, that

17   they do have this lengthy criminal activity that they

18   engaged in and that should be considered as well when it

19   comes to his personal characteristics.

20         Finally, your Honor, the government thinks that

21   it's important and that a factor that is prominent is

22   just punishment and promotion and respect for the law,

23   particularly the latter in this case.  As your Honor has

24   found, Mr. Cohen committed perjury on the stand.  He

25   lied.  This is not someone who at any point has accepted

responsibility or shown an ounce of remorse for anything

that's happened.  Now he may allocute today and that may

change and he may say something to you on that front,

but the reality is this is someone who spent parts of

three trial days lying to the Court, to the jury, and to

everybody in this courtroom, and that needs to be met

with a serious response.

As it was stated in the *Fitzhugh* case, one of the

reasons that the Court there, um, applied the

enhancement for an abuse of a position of trust was

because it found that the defendant had harmed the legal

system he was sworn to uphold.  Well, Mr. Cohen was

sworn to uphold the legal system in this Commonwealth

and Mr. Cohen sat on that stand under oath and lied.  He

harmed the legal system here.  He harmed the court in

that manner.  He harmed this process in that manner.

And that type of affront, your Honor, needs to be met

with a significant response.  And that's one of the many

factors and probably one of the more prominent factors

that's behind the government's recommendation of 84

months.

And so for all these reasons, your Honor, the

government requests that Mr. Cohen be sentenced to a

sentence of imprisonment of 84 months along with the

other aspects of the sentence that the government has

 1    requested.  Thank you.

 2          THE COURT:  One tiny question.

 3          MR. DiSANTIS:  Yes.

 4          THE COURT:  You want me to impose, as a condition

 5    of supervised release, not only that he not work as a

 6    notary during the time of the period of supervised

 7    release but that he, um, during the period of supervised

 8    release, I think it would have to be, affirmatively

 9    renounce his license to be or right to be a permit, or

10    whatever it is, to be a notary?

11          MR. DiSANTIS:  We do, your Honor, and here's why.

12          THE COURT:  I understand why, I'm only wondering

13    whether I actually have the authority to make him do the

14    affirmative act, and I get exactly why you ask.

15          MR. DiSANTIS:  Sure.  I think that as a condition

16    of supervised release you can require him to do that.

17    I'm not aware of any authority that suggests that you

18    can't.

19          THE COURT:  Okay.

20          MR. DiSANTIS:  Thank you.

21          THE COURT:  Thank you.

22          Mr. Krasnoo.

23          MR. KRASNOO:  Your Honor, I first want to tell

24    your Honor that you are sentencing a good man and he's a

25    man who has lived by, I think, as demonstrated by the

1    letters, a code "This above all to my own self be true."

2    It matters not that you find that he has obstructed,

3    what matters is whether or not he truly believes he has

4    obstructed and he does not.  Check-cashing it was,

5    check-cashing it is, check-cashing it will be, that was

6    wrong to use the IOLTA account, money laundering was

7    never his intent, and the fact that anyone else in the

8    world can find that still doesn't destroy his personal

9    belief with it.

10        Does it make him a damned fool?  Maybe.  But it is

11   important to know that he intended no fraud or

12   dishonesty on this court by stating what he stated.

13   He's maintained that position from the day I met him and

14   he has maintained that position no matter what the

15   evidence holds.  Whether he could explain some of the

16   evidence away or none of it away is still irrelevant to

17   what he believes about himself.  And that's very

18   important.

19        And it's important because it's not just in this

20   courtroom that you have to evaluate him, you have to

21   evaluate a 64-year-old man who had been a lawyer for 30

22   years who has countless numbers of people who do more

23   than just support him, they are his friends.  I assure

24   your Honor, on the basis of my experience, that I may

25   have helped several clients, but if I was standing in

1    front of a court of law to be sentenced, those clients

2    wouldn't be here simply because they were clients and I

3    did a good job for them, it either ripens into

4    friendship or it doesn't because the people who come to

5    support you are friends, they're not clients, it's much

6    more than a business relationship.  And a large part of

7    it comes out of the fact that when he did work for

8    people he did it for relatively poor people, people who

9    couldn't afford his means, and he did it for people and

10   did it well apparently.  He put out effort for them.

11        Why would a man who has done that for 30 years be

12   engaged in a crime whose sole purpose is greed?  It is

13   the reputation of all that he has ever been and done as

14   a human being.  He inherits nothing from taking care of

15   his two brothers who are ill, ailing, and dying.  He

16   inherits nothing from most of the people for whom he's

17   helped.  Over and over again you have read in there

18   about specific instances of the kind of help that he

19   gave to those people, that he didn't charge them.  One

20   letter even says that there was an argument about the

21   fact that he wasn't accepting enough of a fee.  That is

22   terribly at odds with this three-year period in his life

23   if it's as long as three years.

24        Now, my brother refers to these letters and,

25   claiming that of course you have to take them into

consideration, tries to point out their limitations.
First, he says these letters are from several people who
only knew his work as an attorney, um, but they didn't
know him very well otherwise.  I think that's disproved
by the people who are here.  One of the letters comes
from his daughter.  I suggest that Mr. DiSantis cannot
truthfully mean that about his daughter.  Two come from
ex-wives.  I don't think your Honor has an ex-wife, I
don't have an ex-wife, but I'd be really surprised as to
how many people would get letters commending their
ex-husband for any reason at all, as an ex-wife, and
writing them to a court.  So those letters go beyond
people who don't know him well.

You have people who are retired that are no longer
doing real estate work and no longer need his help as an
attorney who have come out of the woodwork and told you
how long they've known him, that he helped them get
started in their career paths and they are writing
letters to you today, and they have known him over the
years.  Now granted they knew him initially as an
attorney, but they also know him as a human being.

And he is a human being and he's a good human
being.  If you had to summarize him and I've had the
privilege of knowing him under very terrible
circumstances, I refer to him as a "good guy," he is,

1    with all that that means, and that should not be game-

2    saved, it should not be taken away from him, and the

3    letters should not be treated as really irrelevant as to

4    the points that Mr. DiSantis makes about them.  But the

5    one that's particularly offensive is "maybe the reason

6    he could cut somebody a break on their fee was by

7    putting this cash in his pocket."

8         So I ask your Honor, let's take a look at this

9    cash-in-the-pocket theory.  Has he got a Mercedes?

10   Where's his mansion?  He lives in his brother's house

11   until it's sold.  Where's his extravagant lifestyle?

12   They don't show any of that.  There's no gambling.

13   There's no dozens of women in his life that he helps to

14   support in an extravagant way.  They don't find any

15   purchases of jewelry, they don't find pleasure jaunts on

16   cruises around the world, there's no huge amounts of

17   touring.  Where is it?  Where did that money go if it

18   was so much money that he took as they claim?  It's got

19   to be somewhere.

20        They've got every bank account that he had.  They

21   don't claim and they can't prove that it's secreted

22   anywhere.  There's no safe deposit box.  There's nothing

23   to represent physical evidence of this alleged greed on

24   his part that suddenly transformed him as a human being

25   from roughly the age of 61 to now.

1          And that's the problem we've got.  That's why in

2    their 21 pages of sentencing memorandums they never once

3    mentioned the letters.  They pushed the theory of greed.

4    But when you examine that theory, it doesn't sustain

5    itself here and it can't perpetuate itself here, and

6    that's something I think your Honor has to take into

7    consideration under 3553(a), because greed is part of

8    the nature of the offense.  And so this man doesn't fall

9    in within the normal nature.

10         Of course under Number 1 -- I'm sorry, under 2,

11   your Honor is governed by *Jimenez-Beltran* and *Gall,* the

12   penalty to be imposed upon Mr. Cohen has to be serious,

13   but it should be no greater than necessary.  The

14   parsimony principle is alive and well in this

15   Commonwealth -- in this country, and in this circuit.

16   And I like to think I had a little bit to do with that

17   because *Jimenez-Beltran* was my case, but I'm not

18   egotistical enough to believe that, my name will fade

19   from it, what's important is the rule of law in *Jimenez-*

20   *Beltran,* so that your Honor is to impose a sentence

21   that's necessary but not greater than necessary, no

22   matter what that necessary sentence is.

23         I'm not going to read from any of the letters, I

24   think your Honor has indicated that you read all --

25              THE COURT:  I read them all.

1          MR. KRASNOO:  Nor do I want to segregate out one

2     as more important than the other, because I think they

3     come from a wide swath of human beings that all shed

4     some illumination on the total human being that

5     Mr. Cohen is.  So to segregate out one and elevate it

6     for temporary importance would be doing a disservice to

7     the others.

8          I think it also speaks volumes, as your Honor

9     mentioned yesterday, that many persons were here in the

10    back of the courtroom and some still are here today, two

11    days in a row, it obviously indicates that they think

12    Mr. Cohen is a significant human being for whom they

13    have a great deal of liking, admiration, and believe

14    that he should be fairly treated.  And they have

15    communicated that, even though silent, but by their

16    group presence.

17         Of course this offense was serious, your Honor.

18    The jury has already spoken, it's spoken contrary to

19    what Mr. Cohen believes about himself, and he will find

20    a way to weather the sentence, whatever it is, because

21    he will still remain true to himself.  Your Honor has to

22    find, of course, that this offense is serious, it's

23    money laundering according to the jury, it's, um,

24    converting funds to his own interest and use.  And of

25    course he will have, your Honor has indicated, the

1    restitution amount, and as a practical matter a

2    64-year-old man who is going to be going --

3           THE COURT:  62, I thought?

4           MR. KRASNOO:  No, 64.

5           THE COURT:  64?

6           THE DEFENDANT:  I'd like it to be 62.

7           THE COURT:  Then 64 it is.

8           Go ahead, Mr. Krasnoo.  I'm sorry.

9           MR. KRASNOO:  A 64-year-old man, um, who is going

10   to be out of the practice of law, is not going to be

11   able to restart his career very easily or very well when

12   he comes out, nor is he going to be able to work for

13   someone else because who the heck wants to hire a

14   64-year-old ex-lawyer in any capacity where he might

15   still be able to use his law and train for readmission

16   to the bar.

17          Readmission to the bar in Massachusetts is quite

18   strenuous, not impossible, but quite strenuous.

19   He has yet to be disbarred, but that is a certainty

20   having been convicted of these offenses and once he's

21   sentenced.  The period of time for disbarment is, as a

22   practical matter, anywhere from three years to life, but

23   that's a long period of time when you're at the age he

24   is.

25          What is the adequate deterrence to the criminal

conduct?  I suggest to you that you've heard about three
major people in this case, Grullon, Gonzalez-Pabon, and
Mr. Cohen, but you've also heard hovering around that
Mr. Felipe Garcia-Wilson and there's a person who is
unknown to me but also mentioned as a co-defendant in
the presentence report, I know nothing about that person
or the role that he played.  And we do know that people
had to file false income tax returns, um, and we don't
know who those people are, and we don't know who the
people are who received those checks initially at the
addresses, the Meridian Street address, for example.
But in assessing the three that we do know, I suggest
that the roles they played are different, their
actuating motives are different, and of course what's
significant about it is that each one probably is likely
to receive a different sentence, if for no other reason,
due to deterrence.

     What sentence could possibly reflect adequate
deterrence for an attorney?  The fact that an attorney
can be disbarred for any reason at all, for a second or
third OUI, for striking or assaulting his wife, for
manipulating large amounts of funds, the deterrence is
also there for an attorney not to commit a crime, and
once again it comes back to that the jury has found that
he has committed a crime and he believed that what he

did was check-cashing, and whether he was foolish or not

is not the determining factor.  So whether you put him

in the can for a day, a year, six years, or the amount

of time the government is recommending, that's a factor

and a red flag for deterrence for any attorney who's out

there.  And any attorney who's out there knows that when

an attorney is indicted, his career is remarkably

pulverized.  It doesn't matter whether he's found not

guilty, his practice is pulverized.  Why?  Because the

public perception of him will always be -- if he's found

not guilty, "Do you see that guy, he's an attorney, he

beat his case."  That's public perception.  It's not

that the person was never not guilty, it's that he beat

the case, somehow there's a technicality in it that

allowed him to beat it.  And an attorney is forever

stained when changed.  And that has happened to several

attorneys.

In this case Mr. Cohen has been convicted,

whatever sentence you impose upon him is going to be a

sentence that all other attorneys will read and, for

most attorneys, it's going to make no difference because

they already know how they have to conduct their life.

For any other attorney out there who's going to commit a

crime or wants to commit a crime or wants to be greedy,

a deterrence factor will provide nothing.  There isn't a

single attorney among the four of us here, the five of

us here, who has not encountered -- when you had your

years as an attorney, of other attorneys where you felt

their conduct fell far short of the ethical lines that

you drew for yourself, and some of them have been

caught, and some of them haven't, and some of what they

did you believe to be tantamount to criminal conduct.

And so it's not going to stop the attorneys.  An evil

attorney who seeks to manipulate the law to use it for

his own benefit will still be out there and undeterred

by whatever sentence, "That isn't going to happen to me,

I'm smarter than that," and any other attorney who

wouldn't come close to it at all is not going to be

deterred because that's not the way he thinks,

That's not his lifestyle.

To protect the public from further crimes of the

defendant?  So if we look, his crime started three years

ago and he was crimeless up to Age 61.  We didn't have

to protect the public from further crimes from him then

and what crimes can he commit now at the age of 64?

He can't have an IOLTA account when he's not an

attorney.  I suspect there are banks who when he

applies, if he ever gets reinstated as an attorney for

an IOLTA account, will forbid him from having it, "Oh, I

remember you, you're the guy who used an IOLTA account

1   to -- no, way, we don't want your business, we don't

2   want you at this bank."  So I don't believe that you

3   have to worry that he's ever going to appear in front of

4   you or any other judge again for any crime at all.

5        I think he's severely hampered in his capacity to

6   commit crimes unless he commits the crimes that can

7   happen to any one of us through bad luck.  You start up

8   slowly at an intersection, just as someone walks off the

9   curb, you hit that person and he dies, it's involuntary

10   manslaughter.  But that can happen to any one of us.

11   But apart from that, I don't see Mr. Cohen committing a

12   crime at all and I suggest there's no evidence to

13   suggest that he would be bent or intent on continued

14   criminal activity.

15        I don't think he needs educational or vocational

16   training, medical care, or other correctional treatment,

17   there's nothing to show that it's drugs or alcohol or

18   gambling, he has no addictions that have ever been shown

19   in this case.  And so what do I see as the appropriate

20   sentence for Mr. Cohen?

21        I see a sentence that's appropriate, your Honor,

22   between 2 to 3 years.  Why?  Any lawyer who gets a

23   sentence of any amount of time that puts him in custody

24   is serving a heavy penalty.  That's Number 1.  Number 2,

25   2 to 3 years sends a message to the public that this is

not a love tap, that there's been no leniency applied
simply because he's an attorney, he's given no special
favors at all.  I have in mind, your Honor, other
attorneys who have been convicted, there was one in, um,
Lawrence who made over a million dollars for several
years each year in creating false insurance claims out
of staged auto accidents.  He has since been reinstated.
He served a period of 2 years -- actually he was
sentenced to a period of 2 or 3 years and he was
released, and he's reinstated now having been disbarred
before.

The 2 to 3 years, your Honor, allows him to come
out without having a significantly altered health
problem.  He has minor health problems now, that's not
unusual for someone who's 64.  I at 75 know what minor
problems are.  You divide the line very carefully at
this age, "fatal" versus "nonfatal," nonfatal you can
live with, fatal, you've got to gear up and fight.  But
things can happen over a period of time when you're in
that age and so a short period of sentencing at least
ensures that he may be able to escape
severely-plummeting health and come out and still be
able to function, your Honor.

Have in mind as well, your Honor, that if you
sentence him to the period of time that the government

1    wants, which is a very lengthy period of time, that he's

2    near 70.  We have to remember that when he comes out, he

3    has nowhere to live, he first has to establish that and

4    find a place to live.  He has no job, and most people

5    aren't going to want to hire him for the jobs for which

6    he could now work, if he can't work as an attorney,

7    because he's overqualified and he's got no talents for

8    the kind of jobs that could produce a decent income such

9    as, um, being a host at a restaurant, something that

10   involved discretion and judgment making.  Moreover,

11   given the offense that he's got, it's a rare job that's

12   going to afford him the opportunity to have access to

13   the cash register or the checking account of any

14   particular business.  So his opportunities for

15   employment are severely foreclosed and he will need some

16   time to be able to try to find a way to make a living.

17        During that period of time he will start to

18   qualify for Social Security, um, but he will not be

19   entitled to the benefits while he's in the can and it

20   will take some time to implement, if getting any

21   benefits at all, when he gets out.

22        I think, your Honor, as well, from my client's

23   point of view, I think it needs to be stated, that the

24   true evil man of the three is ensconced in the even

25   warmer climate than we're provided today in the

1    Dominican Republic and probably has no intention to

2    return.  He's stuck it to my client, he was dishonorable

3    and a traitor in terms of friendship, and my client

4    bears a heavy price for having trusted him, liked him,

5    and assumed that he would do no evil.

6         With regard to Mr. Gonzalez-Pabon, he too is an

7    attorney, theoretically he should have known better, but

8    his actuating motives are demonstrated by the papers I

9    told your Honor about before, his greed is rampant and

10   shows in those records, my client is not and does not

11   show in any records at all.

12        I think the government's recommendation is too

13   severe for the total characteristics concerning my

14   client.

15        May I have a moment, your Honor?

16        THE COURT:  You may.

17        (Pause.)

18        MR. KRASNOO:  Thank you, your Honor.

19        THE COURT:  All right.

20        Mr. Cohen, you have the right, if you wish, but

21   you're not required to do so, to allocute, to say

22   whatever, if anything, you wish to say, and before I

23   impose sentence.

24        THE DEFENDANT:  Thank you, your Honor.

25        First of all, your Honor, I want to thank you at

least for listening.  Um, you know I may disagree with some of your decisions, but I appreciate -- I think you kept an open mind and you did listen and deliberated.

And I know, your Honor, what Lou Gehrig meant when he said "Today I'm the luckiest man on earth."  Lou Gehrig suffered from ALS, now commonly known as "Lou Gehrig's disease."  My father was diagnosed with Lou Gehrig's disease when he was in his 50s.  Years later, after his death, we realized that he did not have Lou Gehrig's disease, as he lived with the disease for over 25 years, that he suffered from muscular dystrophy.  He would constantly fall but he would just pick up -- pick himself up, and when asked, "How are you?" he would answer "Baruch Ashem," which literally means "Blessed be God," but generally means "Thank God."

My oldest brother, Shalom, suffered from frontal temporal dementia, he was diagnosed in 2009, and it took his life five years ago at the age of 63.  I became his caregiver for most of the last three years of his life.

My older brother, Moshe, suffered from the same disease that my father had, he was diagnosed with a muscular dystrophy called inclusion body myositis, which took his life two years ago at the age of 63.

But when both of them were asked, "How are you?" they always answered, "Thank God."

1          My good friend, Wayne, went into a diabetic coma

2     and probably over -- it was over 10 years ago.  He

3     wasn't supposed to live even past the night, although

4     he's still walking around today, but he's in a lot of

5     pain.  But he never complains.

6          My friend Hasan, who I call my brother, has

7     Parkinson's disease, he's 51 years old, he has

8     Parkinson's disease.  But he never complains.

9          I'm lucky I don't suffer from any of these

10    diseases, although I do have my own issues that I have

11    to deal with, yet I feel that I am blessed.  I look

12    around here and I see lots of friends, good friends,

13    friends that I can count on, if I need to, and friends

14    who have been able to count on me over the years.  These

15    friends know my true character.  They know my passion

16    for helping others.

17         Ed Brown was losing his house that he inherited

18    from his father, this was back, I think, in 1994.  I

19    stepped in -- because his house was in foreclosure and I

20    stepped in and negotiated with the bank attorney, the

21    foreclosing attorney, and I got Mr. Brown to refinance

22    his house at, I think it was 6 3/4 percent with Wells

23    Fargo Bank, which at the time was the best rate offered

24    at the time.  I did the closing on his behalf, and other

25    than getting a legal fee of $300, I never charged him.

1          Years later, approximately 10 years ago,

2     Mr. Brown, who owned a car lot -- he actually had owned

3     a gas station with a car lot associated with it, he had

4     a car stolen off the lot and he was seeking $4200 from

5     the insurance company, they refused to pay it.  I

6     represented him first for -- at two examinations under

7     oath and then later, after filing a lawsuit against the

8     insurance company, I attended a deposition for him.  Two

9     weeks before trial we negotiated a settlement and we got

10    $6,000, considerably more than he originally wanted, but

11    at the time he really wanted more because he was not

12    happy with the insurance company.  And I said, "You know

13    what, Ed, you just keep the whole thing," and I never

14    charged him anything.  The satisfaction of helping a

15    good friend was enough for me.

16         When my friend Wayne needed money to pay off child

17    support, I lent it to him, this was back in 2004 or so.

18    When Jim Sallow was being sued in Superior Court,

19    approximately 8 years ago, I defended his case without

20    charge and negotiated a settlement with the plaintiff's

21    attorney.  When the attorney was told that he could save

22    $30,000 if he just paid off the money immediately, I

23    found somebody to give him a loan so that he could go

24    ahead and save the $30,000.

25         All of my friends who are here, who are not here,

tell you that I would represent anybody for little or no money.  My passion is and was helping people, not making money.

Bob Vassey will tell you that he and I, he's the one I think that, um, my attorney referred to, we had arguments, at one point he asked me, "How much are you going to charge?"  I said "750."  He says, "No, I want to give you $1500."  I said "No, I want 750."  "No, 1500."  I said, "Okay I'll take 1000."  He wouldn't stop until I took the full 1500.

Paul Rose once told me that he was embarrassed by how little I charged.

You know, I have been found guilty by my, quote, "peers" in a court of law, but the jurors never got to know who I am, they never got to hear anything about my character, they never got to understand me, and this I say, "I swear on my parent's souls that I never had any criminal intent."  In fact I never knew that a crime was even being committed.  And I know that the jury found otherwise, I know your Honor found otherwise.  I was blind but I was not willfully blind.  But I know I did things that were wrong and I clearly should not have done them.

As a result, I will no longer be able to practice law, my passion and career, the only job that I've done

1  in the last 36 years.  (Cries.)  Excuse me.

2      I will no longer be able to help my friends or my

3  friends' friends or anyone else in the same way.  I hope

4  when this is all over, I will be able to help people

5  once again, if not in the legal field, then in some

6  other way.

7      As I stated, what I did was wrong, and I'm --

8  (Cries.)  Man.

9      I want to apologize to those I've let down.  First

10  -- first to my daughter, Ashley.  Also to my friends.  I

11  feel sorry for those persons whose identities were used

12  in the tax refund scheme, but I did not cause their

13  identities to be used.  My fault was that I trusted

14  Mr. Grullon, whom I thought of as a friend, and he

15  deceived me.

16      I want to apologize to the government for having

17  used my accounts for check-cashing, which was clearly

18  inappropriate.  I hope that I will have a chance, in my

19  life, to redeem myself.

20      Before I close I want to thank my attorney, who I

21  think has gone above and beyond, in trying to defend me,

22  he believed in me and to me that was very important.

23      I want to thank you for the time, for listening to

24  me, and for the opportunity to address the Court.  Thank

25  you.

```
1          THE COURT:  Thank you, Mr. Cohen.  I'm going to
2     take a 5-minute recess to think about what Mr. DiSantis,
3     Mr. Krasnoo, and Mr. Cohen have said, and then I will
4     resume.
5          (Recess, 4:00 p.m.)
6          (Resumed, 4:20 p.m.)
7          THE COURT:  Okay, I have a number of things that I
8     want to say.
9          Mr. Cohen, the first is this, that this was not a
10    mistake, this was not just an innocent person duped by a
11    bad criminal, the facts here lead me to only one
12    conclusion and I -- which is that you are a knowing
13    criminal participant in this scheme to steal money, and
14    this is the hard-earned tax dollars of everybody in the
15    room, everybody in the country, and I just want to go
16    over that because I think it bears mentioning.
17         This was obviously a scam on the government from
18    the outset and you knew it.  These were United States
19    Treasury checks, as you know, and as I said before
20    they're good as gold, um, but any bank, any
21    check-cashing firm, any person, if somebody came to them
22    with a whole pile of U.S. Treasury checks made out to
23    different people -- in this case you deposited 74 U.S.
24    Treasury checks in the names of different people just in
25    your Century Bank IOLTA account, knows that they're
```

```
1    fraudulent.  And this, to me, happened when you "sold
2    your soul," so to speak, was at the beginning when you
3    began doing this and you took the money, took the fee
4    for doing this.
5         You could go to any check-cashing company if this
6    were legitimate, any check-cashing firm would cash
7    somebody's U.S. Treasury check if the person showed up
8    with the refund check and identification, but no
9    legitimate check-cashing firm would allow any person to
10   walk up with 10, 30, or 74 U.S. Treasury checks and cash
11   them all without the taxpayer's -- without
12   identification, without anything.  And so I think it was
13   obviously a scam on the government from the beginning
14   and that was why I think they were willing to pay you a
15   fee.  And that would be enough, but there's more.
16        I think Century Bank figured this out, that's why
17   they said to you to stop.  You gave them this concocted
18   story about real estate transactions and they said, "Too
19   bad, stop it."  They didn't want any more checks in
20   their bank.  They said, "We don't want to have anything
21   to do with this."  They didn't use the words, "This is a
22   fraud," but they as much told you that it was a fraud.
23   And these were people who you knew, these were people
24   who you've done business with over the years.  And that
25   would be enough, but there was more.
```

1          You kept going to Brookline Bank and one check was

2     called back by the IRS and you produced this

3     documentation from the payee and you knew that that was

4     fake and you gave it to them anyway.  And they didn't

5     believe your story about her, or the investments, you

6     had the attorney-client privilege excuse, which really

7     makes no sense, um, and they told you to stop, certainly

8     in their bank, and they as much told you it was fraud.

9     And there were, what, 33 checks in total at Brookline

10    Bank.  And that would be enough, but there's more.

11         You went to Citizen's Bank, you opened an account

12    for Grullon and the AD Pro, the professional name, you

13    gave them the debit card, you gave them access to the

14    account.  You knew what he was doing, he was continuing

15    to deposit these checks, these U.S. Treasury checks.

16    And that wasn't the end of it.

17         You went to People's Bank, the detective we've

18    referred to repeatedly spoke with you, he confronted it

19    with you, you told him about some things, he went and

20    checked those things, they weren't accurate, he came

21    back to you and said, "That's not accurate," and you

22    hung up on him, he confronted you with the facts and you

23    weren't honest with him about it.

24         So this was no mistake, the jury was exactly

25    right, I think you committed a knowing -- you

1   participated in and committed a knowing intentional

2   fraud to steal money from the United States and then you

3   lied about it on the witness stand.  And it's sad for me

4   to say this, Mr. Cohen, um, but you committed these

5   felonies and you committed the felonies by being a

6   thief.

7       The guidelines call for a sentence of, um, 78 to

8   97 months in prison and I give due weight to the

9   guideline sentence, but I also consider each of the

10  factors set forth at Section 3553, and in light of these

11  factors I find the sentence that the guidelines call for

12  too high in this circumstance, um, not too high because

13  I don't think you committed a crime, because I think you

14  did commit a crime, not too high because I don't think

15  that you did this knowingly and intentionally, because I

16  think you did, but in light of the purposes that are set

17  forth in 3533, I find the sentence too high.

18      The guidelines call for a sentence and establish

19  your culpability, Mr. Cohen, based upon all of the

20  criminal conduct involved in your conspiracy and related

21  to this course of conduct, but you are not the architect

22  of this conspiracy, you are not the motivator or driving

23  force behind this conspiracy, you did not receive all or

24  even most of the money stolen, and there is no evidence

25  that you personally stole the identities of any

1  individuals or filed the fraudulent tax returns.  These

2  circumstances, in my mind, warrant the lower sentence

3  under factors (a) and (b) of 3553.

4       To the extent the guidelines -- I think that that

5  speaks for itself, but to the extent the guidelines

6  value those things differently and therefore, um,

7  suggest this sentence of 78 to 97 months, in this case,

8  on these facts, is it warranted?  I disagree, um, with

9  the guidelines as a matter of policy, which I believe,

10  under the law, I'm entitled to do.

11       And turning to another factor, there's little need

12  to protect the public from you, that you will never

13  practice law again.  Given your long history of

14  law-abiding conduct, the record suggests that you will

15  not commit further crimes after serving your sentence in

16  prison.

17       And finally, the other factor under Section 3553,

18  is you don't need educational or other correctional

19  training that might be afforded to you in prison.

20       You also have a long record of law-abiding conduct

21  that I consider.  You're 64.  You have no prior criminal

22  record at all.  In the course of your life, Mr. Cohen,

23  you've justly earned the admiration and respect and

24  gratitude of many many people.  I have read each of the

25  letters submitted on your behalf, they speak of a kind,

generous, and ethical man, and two letters in particular

stand out, one is from Patrick McPhee who wrote of the

assistance you gave him in helping him get a college

degree while he was a disabled veteran, and the letter

from your daughter stands out, she writes glowingly not

only of the genuine love of a daughter for her father,

but the inspiration and model you set for her by your

behavior prior to this case in helping others.  And you

should be justly proud of her and her relationship with

you.

Unfortunately, Mr. Cohen, the good work you did

before you joined this criminal scheme do not wipe out,

erase, or excuse the crimes you've committed, and do not

give you a so-called "pass" on the punishment for these

crimes, especially given the concerted and ongoing

nature of the crimes here.  To do so would disregard

Congress's command to consider the general deterrent

effect of a sentence in your case and would disregard

Congress's command to impose a sentence that reflects

the seriousness of the offense and to impose a sentence

that provides just punishment for the crimes that have

been committed.

Now I will say one more thing, Mr. Cohen.  I don't

think, Mr. Cohen, that there's a binary valuation of you

as a human being, that is I don't think that the

judgment of the Court pronounced here is either a

judgment that you are a good and honest person who lived

a good and honest life up to and until you committed

these crimes or that your entire life is a life of crime

and that you are defined utterly and completely by the

crimes for which you stand convicted, I think that you

are -- and as I told you, I think you did commit these

crimes knowingly and intentionally and understandingly

over a sustained period of time and in the face of

repeated people talking to you.  On the other hand, um,

while I understand Mr. DiSantis's comment with respect

to the letters, the later letters, which I think is what

-- and what I understood him to be referring to, the

letters are all consistent, the letters -- the people

who wrote -- who spoke of your conduct a year ago write

in the same way as the people who wrote of your conduct

30 years ago, they write -- they all write in a similar

way.

        And I have no good explanation for why you

committed this crime and why you stand in the particular

situation you stand in now, it may well be, as

Mr. DiSantis suggests, um -- and I don't disagree with

him, but I don't know, but it may well be that a time

came where you just weren't making any money from your

practice and this was an opportunity that presented

itself and you did it and rationalized it, I don't know,
but that's not, um -- at least where there's no
explanation, it's not the defining feature.  But I tell
you that -- that the two, the judgment of the Court and
the sentence you receive, it doesn't mean you didn't do
all the good things that these people in the audience
have spoken of, because you did, and I don't doubt you
did, and I weigh those and I give you credit for those
but there are -- I think the law tells me to consider
them in the sentence I impose and I do consider them,
but there are other factors I consider.

So considering and weighing all of these factors,
I impose a sentence of 54 months in prison.  I find this
sentence is sufficient but not greater than necessary to
meet the purposes set forth in Section 3553.

So pursuant to the Sentencing Reform Act of 1984
and having considered the sentencing factors enumerated
in 18 U.S.C. Section 3553(a), it's the judgment of the
Court that the defendant, R. David Cohen, is committed
to the custody of the Bureau of Prisons to be imprisoned
for a term of 54 months.  The term consists of a term of
54 months on Count 1 and concurrent terms of 54 months
on Counts 2 to 13, 15, 16, and Count 19.

On release from imprisonment the defendant shall
be placed on supervised release for a term of 3 years,

the term consists of 3 years on each count, such terms

to run concurrently.  Within 72 hours of release from

custody of the Bureau of Prisons, the defendant shall

report in person to the district to which he is

released.

It is further ordered that Mr. Cohen shall make

restitution to the -- in the following amount, to the

IRS -- RACS --

I don't think I need to read the address to them,

Ms. Sinclair.

-- in the amount of $1,672,958.74.  The

restitution shall be paid by the defendant jointly and

severally with any other person or persons convicted of

the instant offense who is or who may be ordered to pay

restitution in this matter.  Payment of restitution

shall begin immediately and shall be made according to

the requirements of the Federal Bureau of Prisons Inmate

Financial Responsibility Program while the defendant is

incarcerated and according to a court-ordered repayment

schedule during the term of supervised release.  All

restitution payments shall be paid to the Clerk, U.S.

District Court, for transfer to the identified victim.

The defendant shall notify the United States Attorney

for this district within 30 days of any change of

mailing or residence address that occurs while any

portion of the restitution remains unpaid.  No fine is

imposed as I find Mr. Cohen does not have the financial

ability to pay a fine in addition to restitution.

I've granted the United States's motion for entry

of a preliminary order of forfeiture and I find that the

United States has established the requisite nexus

between this property and the offenses on which the

defendant stands convicted.

I don't need any more on that since I've allowed

the order today, Mr. DiSantis?

MR. DiSANTIS:  No, your Honor.

THE COURT:  While under the probation office's

supervision the defendant shall comply with the

following terms and conditions.

One, the defendant shall not commit another

federal, state, or local crime and shall not illegally

possess a controlled substance.  Two, drug testing

conditions are suspended based on the Court's

determination that the defendant poses a low risk of

future substance abuse.  Three, the defendant shall

submit to the collection of a DNA sample as directed by

the probation office.  Four, the defendant shall comply

with the standard conditions that have been adopted by

the Court, which are described in the United States

Sentencing Guideline Section 5(d)(1.3)(C), and will be

1   set forth in detail on the judgment.  In addition, the

2   following special conditions are imposed.

3        The defendant's prohibited from possessing a

4   firearm, a destructive device, or other dangerous

5   weapon.  The defendant is prohibited from engaging in an

6   occupation, business, or profession that would require

7   or enable him to have access to other people's financial

8   information.  The defendant is to pay the balance of any

9   fine or restitution imposed according to a court-ordered

10  repayment schedule.  The defendant is prohibited from

11  incurring new credit charges or opening additional lines

12  of credit without the approval of the probation office

13  while any financial obligations remain outstanding.  The

14  defendant is to provide the probation office access to

15  any requested financial information which may be shared

16  with the Financial Litigation Unit of the United States

17  Attorney's Office.  And, six, the defendant is

18  prohibited from the practice of law unless -- um, during

19  the term of supervised release, unless authorized by the

20  Court.

21       And, Mr. Krasnoo, do you object to the notary

22  condition that the government --

23       MR. KRASNOO:  I do, your Honor.

24       THE COURT:  You do.

25       To both parts of it or -- that is to prohibiting

1    him from being -- serving as a notary while on

2    supervised release or just the portion that asks him to

3    renounce?

4         MR. KRASNOO:  I do not believe he should be asked

5    to renounce and I believe that in ordering him to

6    renounce would be beyond the jurisdiction or the power

7    of the Court.

8         With regard to ordering that he cannot serve as a

9    notary during that period of time, um, while he's on

10   supervised release, I believe that's a condition that

11   the Court has the power to frame.  The Court can

12   customize, on supervised release, what a defendant can

13   and cannot do, but I don't think that can involve an

14   order ordering him to renounce --

15        THE COURT:  Well, I impose the condition that he

16   shall not serve as a notary during the time of

17   supervised release, that he shall not renew any license

18   if it comes up for renewal, shall not seek a license for

19   or permit as a notary, and shall not act as a notary in

20   any capacity at any time during the term of supervised

21   release.

22        I might be inclined to impose the requirement,

23   Mr. DiSantis, that he renounce.  I don't want to ask you

24   to file a long detailed brief, but maybe, um, I would

25   reserve just on that question.  If you'd just, you know,

1    if you write back, give me some authority that suggests

2    that I can -- that that kind of affirmative act, I could

3    require him to do, that's what I'm wondering about.  I

4    just never thought about it and haven't encountered it

5    before, and I'm not saying I can't do it, but I haven't

6    thought about it before and I'm just not familiar with

7    it.

8            MR. DiSANTIS:  We'll try to do that, your Honor.

9            THE COURT:  All right.

10           It's further ordered that the defendant shall pay

11   to the United States --

12           And it would suffice, if you want, and I don't

13   need a brief, but if you just want to give me a

14   paragraph or a couple of case cites to look at, that's

15   sufficient.

16           It's further ordered that the defendant shall pay

17   to the United States a special assessment of $1,600,

18   which is $100 on each count of conviction, which shall

19   be due immediately.

20           You have, Mr. Cohen, the right to appeal both the

21   conviction and/or the sentence that I have imposed here

22   today.  Any notice of appeal must be filed within 14

23   days of today.  You'd file the notice of appeal with the

24   Clerk with a copy to the U.S. Attorney's Office.

25   Mr. Krasnoo knows how to do that and he can do that for

1    you if you wish.

2         If you wish to ask the Clerk to file the notice of

3    appeal on your behalf, if you're indigent, you could

4    establish your indigency and then you could request

5    that, but you do have counsel to do it for you if you

6    wish.

7         And that leaves just the question of

8    self-surrender or not.

9         Does the government have a view?

10        MR. DiSANTIS:  The government is fine with

11   self-surrender in sort of the normal standard period of

12   time.

13        THE COURT:  All right.  Any reason six weeks

14   wouldn't be reasonable?

15        MR. DiSANTIS:  None that the government can think

16   of.

17        THE COURT:  All right.

18        Mr. Krasnoo, any reason six weeks is not

19   reasonable?

20        MR. KRASNOO:  Um, it's normally acceptable.  I've

21   had only two cases where the Bureau of Prisons has not

22   been able to designate someone within a six-week period

23   of time, but if so that's usually brought to the

24   attention of --

25        THE COURT:  You can bring that to my attention if

1    that happens.

2         Maria, what date is six weeks from today?

3         THE CLERK:  July 6th.

4         THE COURT:  Okay, that's a weekday.

5         All right.  So, Mr. Cohen, you're ordered to

6    self-surrender yourself and turn yourself over to the

7    custody of the Bureau of Prisons by noon on July 6th at

8    the institution designated to you by the Bureau of

9    Prisons and the United States Marshals Service.

10        If at such time you think, Mr. Krasnoo, that the

11   designation hasn't occurred, then you can file a motion

12   and bring it to my attention and I'll consider whether

13   to extend that date or not.

14        Between now, Mr. Cohen, and July 6th, or if for

15   some reason that date were extended, until such further

16   time as you did self-surrender, all of the conditions of

17   bail that applied to you up till now continue to apply

18   until the moment you literally turn yourself into the

19   custody of the Bureau of Prisons.

20        Is there anything else from the government?

21        MR. DiSANTIS:  Nothing from the government, your

22   Honor.

23        THE COURT:  Anything else, Mr. Krasnoo?

24        MR. KRASNOO:  I would ask your Honor to make a

25   recommendation for Fort Devens.  It's local.  It means

1   that his daughter would be able to get out there to see

2   him and some of his friends.

3           THE COURT:  For the medical portion or the camp?

4           MR. KRASNOO:  Well -- if I can have a moment?

5           (Pause.)

6           MR. KRASNOO:  I think just the camp, your Honor.

7   I think his medical conditions aren't serious enough --

8           THE COURT:  I don't think they are, it doesn't

9   strike me as the kind that would require his placement

10  there.

11          Does the government have an opinion on that or

12  not?

13          MR. DiSANTIS:  We do not, your Honor.

14          THE COURT:  All right.

15          I will recommend to the Bureau of Prisons that

16  they place him, if possible, at the Fort Devens prison

17  camp to facilitate, um, his existing and continuing

18  relationship with his daughter and his friends and

19  family.

20          All right.  Is there anything else, Mr. Krasnoo?

21          MR. KRASNOO:  No, your Honor.

22          THE COURT:  All right.  Thank you very much.

23  We're adjourned.

24          (Ends, 4:45 p.m.)

25

1                    C E R T I F I C A T E

2

3

4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5    hereby certify that the forgoing transcript of the

6    record is a true and accurate transcription of my

7    stenographic notes, before Judge Leo T. Sorokin, on

8    Wednesday, May 25, 2016, to the best of my skill and

9    ability.

10

11

12

13   /s/ Richard H. Romanow 07-19-16

14   _____
     RICHARD H. ROMANOW   Date

15

16

17

18

19

20

21

22

23

24

25